McClain MCA 2018

22114481

## REAL ESTATE TERM LOAN 1 NOTE

May 11, 2018

$332,500.00

FOR VALUE RECEIVED, the undersigned (individually and collectively, "Borrower"), hereby promise to pay to the order of RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") the principal sum of Three Hundred Thirty-Two Thousand Five Hundred Dollars and No Cents ($332,500.00) and interest at the rate specified in the Real Estate Term Loan 1 Facility Sheet between Borrower and Lender dated May 11, 2018, along with any replacements (the "Facility Sheet"). Principal and interest are payable to Lender at the times specified in the Facility Sheet. All payments shall be made to Lender in lawful money of the United States of America at 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, or such other place as Lender directs, in same day funds. Each capitalized term used in this note that is defined in the certain Master Credit Agreement between Borrower and Lender dated May 11, 2018 (the "Credit Agreement") will have the meaning specified in the Credit Agreement. This note will be interpreted in accordance with the Drafting Conventions.

This note is referred to in, and is subject to the terms and conditions of the Credit Agreement. Without limitation, the Credit Agreement contains provisions for acceleration of the maturity hereof upon the occurrence of certain stated events.

Borrower has signed this note effective as of the day and year first written above.

**BORROWER**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

MCCLAIN FEED YARD, INC., a Texas corporation

By: _____
BRIAN KEITH MCCLAIN
President

By: _____
CRYSTAL D MCCLAIN
Secretary

22114481

## FACILITY SHEET

### (REAL ESTATE TERM LOAN 1)

This Facility Sheet (as may be amended, modified or supplemented from time to time, referred to herein as this "Facility Sheet") is dated as of January 8, 2008 and is with regard to Facility Loan No. 22114481 between MCCLAIN FEED YARD, INC., a Texas corporation ("Borrower"), MCCLAIN FARMS, INC., a Kentucky corporation ("McClain Farms"), BRIAN KEITH McCLAIN ("Brian McClain") and CRYSTAL D MCCLAIN ("Crystal McClain"), married spouses, and TM CATTLE FEEDERS, INC., a Kentucky corporation ("TM Cattle Feeders") (McClain Farms, Brian McClain, Crystal McClain and TM Cattle Feeders are herein individually and collectively, "Guarantor") and RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") and hereby supersedes any and all previous facility sheets that governed this obligation.

Parties and Lender have entered into a Master Credit Agreement ("MCA") dated May 11, 2018 which may include schedules, addendums, and exhibits thereto. The MCA incorporates by reference and includes a Schedule of Definitions and Covenants ("Schedule of Definitions and Covenants") dated of even date with the MCA and any Applicable Obligor Covenant Schedule. Borrower and Guarantor have received and reviewed the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. All terms, covenants, conditions and restrictions set forth in the MCA as incorporated herein by reference as if fully set forth herein. Capitalized terms contained in this Facility Sheet are used as defined in the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. Some or all of the capitalized terms defined in the Schedule of Definitions and Covenants are used in this Facility Sheet as so defined and the terms of such Schedule of Definitions and Covenants are incorporated by reference into this Facility Sheet for purposes of so defining the capitalized terms that are used in this Facility Sheet in accordance with the Schedule of Definitions and Covenants. To the extent any term is defined in this Facility Sheet, such term shall be deemed to be disregarded, of no used in this Facility Sheet or any amendment, modification or supplement to this Facility Sheet, such term shall be deemed to be the Schedule of Definitions and Covenants, or unless meaning and without any effect. Except as otherwise defined in this Facility Sheet, each term that is defined in Article 8 of this Facility Sheet which is defined in Article 8 of the context otherwise requires, each term that is used in this Facility Sheet which is defined in Article 8 of the UCC shall have the meaning ascribed to that term in Article 8 of the UCC.

Borrower requests that Lender make a Loan pursuant to this Facility Sheet. Lender agrees to make such Loan, subject to the terms and conditions of this Facility Sheet, the MCA and the Schedule of Definitions and Covenants.

### ARTICLE 1 - PRINCIPAL LOAN TERMS

This Facility Sheet is made and entered on the following Loan terms:

1.01   **Loan Type.** The Loan Type being made pursuant to this Facility Sheet is as follows: Real Estate Term Loan 1

1.02   **Loan Amount.** Lender has loaned Borrower the principal sum of $332,500.00.

1.03   **Purpose.** The Real Estate Term Loan 1 must be used only to refinance Real Estate debt.

1.04   **Interest Rate.** The unpaid principal balance of the Real Estate Term Loan 1 will bear interest at the rate of 5.2500% per annum, fixed for the term of the facility, but in no event shall the calculated interest rate under this section be less than zero.

1.05   **Required Payments; Maturity Date.**

   Borrower shall make equal combined payments of principal and accrued interest on the Real Estate Term Loan 1 in an amount calculated to fully amortize the original principal amount of the Real Estate Term Loan 1 over a term of 120 Real Estate Term Loan 1 Loan Months on July 1, 2018 and the first day of each month during the period from that date to the Real Estate Term Loan 1 Maturity Date.

   The unpaid principal balance of, all unpaid accrued interest on, and other charges under this Facility Sheet with respect to the Real Estate Term Loan 1, shall be paid on June 1, 2028 (the "Real Estate Term Loan 1 Maturity Date").

1.06   **Prepayments.** Prepayments of the Real Estate Term Loan 1 may be made at any time without Prepayment Fee or penalty.

1.07   **Definition of "Loan Month".** The term "Real Estate Term Loan 1 Loan Month" means the one month period beginning the first day of the calendar month immediately following the Closing Date, and each successive one month period.

1.08   **The Real Estate Term Loan 1 Note.** The Real Estate Term Loan 1 has been or will be evidenced by a Real Estate Term Loan 1 promissory note in a form provided by Lender (the "Real Estate Term Loan 1 Note").

### ARTICLE 2 - COVENANTS REGARDING THE LOAN TYPE MADE UNDER THIS FACILITY SHEET

2.01   **Prepayments Generally.** Prepayments must be accompanied by all unpaid accrued interest on the Prepayment and all other amounts due under this Facility Sheet. Each Prepayment of a portion of the Loan will be applied to the most remote payment of the principal due under the Facility Sheet. If Lender receives any Prepayment which it is permitted to retain, Lender may accept the Prepayment, except that Lender would be obligated to accept the Prepayment, or the date the principal amount Prepaid would be due under this Facility Sheet, whichever is earlier.

2.02   **Default Rate.** Upon the occurrence of an Event of Default, the principal balance of the Loan and, to the extent permitted by Applicable Law, all other Loan Obligations shall, from the date of the Event of Default until the date Lender exits Borrower that it is cured or cured of all Loan Obligations are paid in full, bear interest at the Real Estate Term Loan 1 Default Rate ("Default Rate" means the rate applicable to the unpaid principal balance of the Real Estate Term Loan 1 plus 5.0000% per annum, and Covenants and Default; and the "Real Estate Term Loan 1 Default Rate" means the Default Rate set forth herein). Interest payable at the Real Estate Term Loan 1 Default Rate shall be paid from the time of such default, as provided in this section may result in compounding of interest. The provisions of this section will be at or provided, or the provisions of this section may result in compounding of interest. The provisions of this section will at no further constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

### ARTICLE 3 - CONDITIONS

3.01   **Conditions of the Loan.** Lender's obligation to make the Loan(s) is subject to the following conditions precedent:

---

The undersigned is a Guarantor pursuant to the terms of an existing Master Guaranty and a Grantor of collateral pursuant to an existing Master Security Agreement from the undersigned Lender with respect to this Facility Sheet and hereby acknowledges the terms and conditions hereof.

GUARANTOR UNDER THE MASTER GUARANTY AND GRANTOR UNDER THE
MASTER SECURITY AGREEMENT:

TM CATTLE FEEDERS, INC., a Kentucky corporation,

Address for Notices:      By:
824 Mullins Lane              BRIAN KEITH McCLAIN
Benton, KY 42025             President

The undersigned is a Guarantor pursuant to the terms of an existing Master Guaranty from the undersigned Lender with respect to this Facility Sheet and hereby acknowledges the terms and conditions hereof.

GUARANTOR UNDER THE MASTER GUARANTY:

MCCLAIN FARMS, INC., a Kentucky corporation

Address for Notices:
824 Mullins Lane        BRIAN KEITH McCLAIN
Benton, KY 42025        President

Address for Notices:
824 Mullins Lane        BRIAN KEITH McCLAIN
Benton, KY 42025

Address for Notices:
824 Mullins Lane        CRYSTAL D MCCLAIN
Benton, KY 42025

LENDER:

RABO AGRIFINANCE LLC

Address for Notices:
14767 N. Outer 40 Rd., Suite 400        By:
Chesterfield, MO 63017              Name:
Attention: Loan Closing Department    Title:

McClain MCA 2018
Real Estate Term Loan 1 Facility Sheet            3

---

(g)   Guarantor has executed and delivered to Lender a guaranty of the payment and performance of the Loan Obligations (the "Guaranty").

(h)   Lender has received a written opinion from Borrower's and Guarantor's legal counsel acceptable to Lender, covering all issues required by Lender;

(i)   No Event of Default or event which, with the passage of time or the giving of notice would constitute an Event of Default has occurred and remains uncured; and

(j)   reimbursement of Lender's out-of-pocket expenses, including Legal Fees and any fees and costs payable by Lender as set forth in the MCA or any amendment, modification or supplement thereto, incurred in connection with the underwriting of the Loans or the Closing.

### ARTICLE 4 – REPRESENTATIONS AND WARRANTIES

Until such time as all Obligations have been paid in full and except for no obligation to make any additional advance under the Loan(s), the Person or Persons being one or more of the Borrowers as may be specifically named in any of the following representations and covenants) agrees to and makes the following representations and covenants:

4.01   **Master Credit Agreement Representations.** Borrower re-makes and confirms all of Borrower's representations set forth in the MCA.

4.02   **Entire Agreement.** This Facility Sheet and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Borrower concerning this credit; (ii) replace any prior oral or written agreements between Lender and Borrower concerning this credit; and (iii) are intended by Lender and Borrower to be the final, complete and exclusive statement of the terms agreed to by them.

4.03   **Covenants.** Borrower hereby makes and agrees to be bound by all of the Reporting Requirements as set forth on Schedule 1 attached hereto and made a part hereof.

4.04   **Reporting Requirements.** Borrower hereby makes and agrees to be bound by all of the Reporting Requirements as set forth on Schedule 2 attached hereto and made a part hereof.

4.05   **WAIVER OF PRIOR CLAIMS.** BORROWER WAIVES AND RELEASES ANY AND ALL CLAIMS AGAINST LENDER, ITS PARENT, SUBSIDIARIES, AFFILIATES AND ITS MERGED PREDECESSORS, AS SERVICES OF AMERICA, INC., THE SUBSIDIARY OF SUCH PREDECESSOR, AND ALL OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS, PARTICIPANTS, ASSIGNS, PARTICIPANTS, AGENTS AND EMPLOYEES OF EACH AND ALL OF THE FOREGOING, RELATING OR PERTAINING TO OR AS A RESULT OF THE EXISTING LOANS, AND ANY OTHER ACT OR OMISSION WHICH HAS OCCURRED PRIOR TO THE EXECUTION OF THIS FACILITY SHEET, INCLUDING ALL CLAIMS OF USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, OR LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR IN CONTRACT, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION

4.06   **Expenses.** The Borrower shall pay within ten (10) Business Days after demand from Lender, all costs and expenses incurred (or reimburse Lender for payment of) in connection with the preparation, execution, delivery, filing, and administration of this Facility Sheet (including, without limitation, Legal Fees incurred in connection with the preparation of this Facility Sheet and advising the Lender as to its rights, and the cost of any credit verification reports or field examinations of the Borrower's properties or books and records).

4.07   **State Specific Addendum.** The following state specific language is hereby added to this Facility Sheet as set forth on Schedule 3 attached hereto and made a part hereof.

4.08   **Counterpart Execution.** This Facility Sheet may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Facility Sheet transmitted by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Facility Sheet for all purposes; provided, however that Borrower shall promptly deliver an original signed copy of this Facility Sheet to Lender.

BORROWER AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT:

MCCLAIN FEED YARD, INC., a Texas corporation,

Address for Notices:      By:
824 Mullins Lane              BRIAN KEITH McCLAIN
Benton, KY 42025             President

McClain MCA 2018
Real Estate Term Loan 1 Facility Sheet            2

---

## SCHEDULE 1

### Covenants

Until such time as all Obligations have been paid in full:

1.05   **Insurance.**

   (a)   If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the lesser of (i) the full unpaid principal balance of the Loan, plus any prior Liens on the property securing the Loan, (ii) the maximum amount of any insurance available under the Hedging Agreements as calculated by Swap Counterparties, plus any prior Lien on the property securing the Loan, or (iii) the Real Estate Term Loan 1 Maximum Amount and other Counterparties' derivative exposure under the Hedging Agreements in any structure located in the flood hazard area, or (iii) the maximum limit of coverage available under the National Flood Insurance Program for the particular type of property, up to the maximum policy limits set under the National Flood Insurance Program, or is otherwise required by Lender, and to maintain such insurance for the term of the Loan.

McClain MCA 2018
Real Estate Term Loan 1 Facility Sheet            4

SCHEDULE 2

**Reporting Requirements**

2.01    *Reporting Requirements.* Borrower shall furnish to Lender:

(a)    promptly upon receipt, copies of all Notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Substances with regard to Borrower's property, activities, or operations, or (ii) any claim against Borrower regarding Hazardous Substances;

(b)    promptly upon Lender's request, all other books, records, statements, lists of property and accounts, budgets, forecasts, reports, records or other information pertaining to the condition or operations of Borrower or Guarantor requested by Lender.

SCHEDULE 3

STATE SPECIFIC ADDENDUM

1.01    Insurance.

1.02    *Indemnification.*

1.03    *Notice of Final Agreement.*

1.04    *Waiver of Appraisal Rights.* Guarantor hereby agrees that:

1.05    *Business Loan.* Borrower acknowledges that the proceeds of the Loan are primarily for agricultural, commercial, investment or business purposes, and are not for a consumer transaction.

22114481

FACILITY SHEET

(REAL ESTATE TERM LOAN 1)

ARTICLE 1 – PRINCIPAL LOAN TERMS

This Facility Sheet is made and entered into the following Loan terms:

1.01    *Loan Type.* The Loan Type being made pursuant to this Facility Sheet is as follows: Real Estate Term Loan 1.

1.02    *Loan Amount.* Lender has loaned Borrower the principal sum of $332,000.00.

1.03    *Purpose.* The Real Estate Term Loan 1 must be used only to refinance Real Estate debt.

1.04    *Interest Rate.* The unpaid principal balance of the Real Estate Term Loan 1 will bear interest at the rate of 5.250% per annum.

1.05    *Required Payments; Maturity Date.*

1.06    *Prepayments.* Prepayments of the Real Estate Term Loan 1 may be made at any time without Prepayment Fee or penalty.

1.07    *Definition of "Loan Month."* The term "Real Estate Term Loan 1 Loan Month" means the one month period beginning on the first day of the calendar month immediately following the Closing Date.

1.08    *The Real Estate Term Loan 1 Note.* The Real Estate Term Loan 1 has been or will be evidenced by this Facility Sheet and a promissory note in a form provided by Lender (the "Real Estate Term Loan 1 Note").

ARTICLE 2 – COVENANTS REGARDING THE LOAN TYPE MADE UNDER THIS FACILITY SHEET

2.01    *Prepayments Generally.*

2.02    *Default Rate.*

ARTICLE 3 – CONDITIONS

3.01    *Conditions of the Loan.* Lender's obligation to make the Loan(s) is subject to the following conditions precedent:

"Guaranty has executed and delivered to Lender a guaranty of the payment and performance of the Loan Obligations (the "Guaranty").

(b)    Lender has received a written opinion from Borrower's and Guarantor's legal counsel acceptable to Lender, covering all issues required by Lender;

(c)    No Event of Default or event which, with the passage of time or the giving of notice would constitute an Event of Default has occurred and remains uncured; and

(d)    reimbursement of Lender's out of pocket expenses, including Legal Fees and any fees and costs payable by Lender as set forth in the MCA or any amendment, modification or supplement thereto, incurred in connection with the underwriting of the Loans or the Closing.

**ARTICLE 4 – REPRESENTATIONS AND WARRANTIES**

Until such time as all Obligations have been paid in full and Lender has no obligation to make any additional advance under the Loan, Borrower (or the Person or Persons being one or more of the Borrowers as may be specifically named in any of the following representations and covenants) agrees to and makes the following representations and covenants:

4.01    **Master Credit Agreement Representations.** ...

4.02    **Entire Agreement.** This Facility Sheet and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Borrower concerning this credit; (ii) replace any prior oral or written agreements between Lender and Borrower concerning this credit; and (iii) are intended by Lender and Borrower as the final, complete and exclusive statement of the terms agreed to by them.

4.03    **Covenants.** Borrower hereby makes and agrees to be bound by all of the Covenants as set forth on Schedule 1 attached hereto and made a part hereof.

4.04    **Reporting Requirements.** Borrower hereby makes and agrees to be bound by all of the Reporting Requirements as set forth on Schedule 2 attached hereto and made a part hereof.

4.05    **WAIVER OF PRIOR CLAIMS.** BORROWER WAIVES AND RELEASES ANY AND ALL CLAIMS AGAINST LENDER, ITS PARENT, SUBSIDIARIES, AFFILIATES AND ITS MEMBERS ...

4.06    **Expenses.** The Borrower shall pay within ten (10) Business Days after demand from Lender, all costs and expenses incurred (or ...

4.07    **State Specific Addendum.** The following state specific language is hereby added to this Facility Sheet as set forth on Schedule 3 attached hereto and made a part hereof.

4.08    **Counterpart Execution.** This Facility Sheet may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. ...

BORROWER AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT:

MCCLAIN FEED YARD, INC., a Texas corporation

Address for Notices:
824 McLon Lane
Benton, KY 42025

By: _____
BRIAN KEITH MCCLAIN
President

McClain MCA 2018
Real Estate Term Loan 1 Facility Sheet
2

---

The undersigned is a Guarantor pursuant to the terms of an existing Master Loan Guaranty and a Grantor of collateral pursuant to an existing Master Security Agreement from the undersigned to Lender with respect to this Facility Sheet and hereby acknowledges the terms and conditions hereof.

GUARANTOR UNDER THE MASTER GUARANTY AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT:

7M CATTLE FEEDERS, INC., a Kentucky corporation

Address for Notices:
824 McLon Lane
Benton, KY 42025

By: _____
BRIAN KEITH MCCLAIN
President

The undersigned is a Guarantor pursuant to the terms of an existing Master Loan Guaranty from the undersigned to Lender with respect to this Facility Sheet and hereby acknowledges the terms and conditions hereof.

GUARANTOR UNDER THE MASTER GUARANTY:

MCCLAIN FARMS, INC., a Kentucky corporation

Address for Notices:
824 McLon Lane
Benton, KY 42025

By: _____
BRIAN KEITH MCCLAIN
President

Address for Notices:
824 McLon Lane
Benton, KY 42025

BRIAN KEITH MCCLAIN

Address for Notices:
824 McLon Lane
Benton, KY 42025

CRYSTAL MCCLAIN

LENDER:

RABO AGRIFINANCE LLC

By: _____
Name: _____
Title: _____

Address for Notices:
14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017
Attention: Loan Closing Department

McClain MCA 2018
Real Estate Term Loan 1 Facility Sheet
3

---

**SCHEDULE 1**
**Covenants**

Until such time as all Obligations have been paid in full:

1.01    **Insurance.**

(a)    If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the lesser of (1) the full unpaid principal balance of the Loan, plus Swap Counterparties' defaultive exposure under the Hedging Agreements, as calculated by Swap Counterparties, plus any other Liens on the property securing the Loan, (2) the total replacement value of any structure located in the flood hazard area, or 3) the maximum policy limits set under the National Flood Insurance Program for the particular type of property, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the Loan.

McClain MCA 2018
Real Estate Term Loan 1 Facility Sheet
4

---

**SCHEDULE 2**
**Reporting Requirements**

2.01    **Reporting Requirements.** Borrower shall furnish to Lender:

(a)    promptly upon receipt, copies of all Notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Substances with regard to Borrower's property, activities, or operations, or (ii) any claim against Borrower regarding Hazardous Substances;

(b)    promptly upon Lender's request, all other books, records, statements, lists of property and accounts, budgets, forecasts, reports, records or other information pertaining to the condition or operations of Borrower or Guarantor requested by Lender.

McClain MCA 2018
Real Estate Term Loan 1 Facility Sheet
5

SCHEDULE 3

STATE SPECIFIC ADDENDUM

1.01    Insurance.

1.02    Indemnification.

1.03    Notice of Final Agreement.

1.04    Waiver of Appraisal Rights.

1.05    Business Loan.

McClain M/CA 2018
Real Estate Term Loan 1 Facility Sheet

22114481

## FACILITY SHEET

### (REAL ESTATE TERM LOAN 1)

This Facility Sheet (as may be amended, modified or supplemented from time to time, referred to herein as this "Facility Sheet") is dated as of December 16, 2020 and is with regard to Facility Loan No. 22114481 between MCCLAIN FEED YARD, INC., a Texas corporation ("Borrower"), MCCLAIN FARMS, INC., a Kentucky corporation ("McClain Farms"), BRIAN KEITH McCLAIN ("Brian McClain"), an unmarried person who is not part of a civil union or domestic partnership, and 7M CATTLE FEEDERS, INC., a Kentucky corporation ("7M Cattle Feeders") (McClain Farms, Brian McClain, and 7M Cattle Feeders are herein individually and collectively, "Guarantor") and RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") and hereby supersedes any and all previous facility sheets that governed this obligation.

Parties and Lender have entered into a Master Credit Agreement ("MCA") dated May 11, 2016 which may include schedules, addendums, and exhibits thereto. The MCA incorporates by reference and includes a Schedule of Definitions and Covenants (the "Schedule of Definitions and Covenants") dated of even date with the MCA and any Applicable Obligor Covenant Schedule. Borrower and Guarantor agree that Borrower and Guarantor have received and reviewed the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. All terms, covenants, conditions, restrictions set forth in the MCA are incorporated herein by reference as if fully set forth herein. Some or all of the capitalized terms and restrictions used as defined in this Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule are defined and the terms of such Schedule of Definitions and defined in the Schedule of Definitions and Covenants are used in this Facility Sheet for purposes of so defining the capitalized terms of such Schedule of Definitions and Covenants but is not Covenants are incorporated by reference into this Facility Sheet. To the extent any term is defined in the Schedule of Definitions and Covenants and in accordance with the Schedule of Definitions and Covenants. To the extent any term is defined in both and the terms be disregarded, of no used in this Facility Sheet or any amendment, modification or supplement to this Facility Sheet, the MCA or its Schedule of Definitions and Covenants, or unless meaning set without any effect. Except as otherwise defined in this Facility Sheet, the MCA or the Schedule of Definitions and Covenants, the contrast otherwise requires, each term that is used in this Facility Sheet which is defined in Article 9 of the UCC shall have the meaning assigned that term in Article 9 of the UCC.

Borrower requests that Lender make a Loan pursuant to this Facility Sheet. Lender agrees to make such Loan, subject to the terms and conditions of this Facility Sheet, the MCA and the Schedule of Definitions and Covenants.

### ARTICLE 1 - PRINCIPAL LOAN TERMS

This Facility Sheet is made and entered on the following Loan terms:

1.01    **Loan Type.** The Loan Type being made pursuant to this Facility Sheet is as follows: Real Estate Term Loan 1

1.02    **Loan Amount.** Lender shall lend or has loaned Borrower the original principal amount of $332,500.00.

1.03    **Purpose.** The Real Estate Term Loan 1 must be used only for refinance of Real Estate debt.

1.04    **Interest Rate.** The unpaid principal balance of the Real Estate Term Loan 1 will bear interest at the rate of 5.290% per annum, fixed for the term of the facility, but in no event shall the calculated interest rate under this section be less than zero.

1.05    **Required Payments; Maturity Date.**

(a)    Borrower shall make equal combined payments of principal and accrued interest on the Real Estate Term Loan 1 in an amount calculated to fully amortize the original principal amount of the Real Estate Term Loan 1 over a term of 120 Real Estate Term Loan 1 Loan Months on July 1, 2016 and the first day of each month during the period from that date to the Real Estate Term Loan 1 Maturity Date.

(b)    The unpaid principal balance of, all unpaid accrued interest on, and other charges under this Facility Sheet with respect to the Real Estate Term Loan 1, shall be paid on June 1, 2028 (the "Real Estate Term Loan 1 Maturity Date").

1.06    **Prepayments.** Prepayments of the Real Estate Term Loan 1 may be made at any time without Prepayment Fee or penalty.

1.07    **Definition of "Loan Month."** The term "Real Estate Term Loan 1 Loan Month" means the one-month period beginning on the first day of the calendar month immediately following the Closing Date, and each successive one month period.

1.08    **The Real Estate Term Loan 1 Note.** The Real Estate Term Loan 1 has been or will be evidenced by this Facility Sheet and a promissory note in a form prescribed by Lender (the "Real Estate Term Loan 1 Note").

### ARTICLE 2 - COVENANTS REGARDING THE LOAN TYPE MADE UNDER THIS FACILITY SHEET

2.01    **Prepayments Generally.** Prepayments must be accompanied by all unpaid accrued interest on the Prepayment and all other amounts due under this Facility Sheet. Each Prepayment of a portion of the Loan will be applied to the most recent payment of the principal due under this Facility Sheet. If Lender receives any Prepayment which is permitted to refuse, Lender may accept the Prepayment, except that Lender may, as a condition of acceptance, require the payment of interest which would accrue on the amount Prepaid through the date when Lender would be obligated to accept the Prepayment, or the date the principal amount Prepaid would be due under this Facility Sheet, whichever is earlier.

2.02    **Default Rate.** Upon the occurrence of an Event of Default, the unpaid balance of the Loan will bear interest at the rate permitted by Applicable Law, at other Loan Obligations shall, from the date of the Event of Default unless Lender notifies Borrower that it is waived or cured or all Loan Obligations are paid in full, bear interest at the Real Estate Term Loan 1 Default Rate. Subject to the provisions of the Schedule of Definitions and Covenants and this Facility Sheet, the "Real Estate Term Loan 1 Default Rate" means interest rate applicable to the unpaid principal balance of the Real Estate Term Loan 1 plus 10.000% per annum. Interest payable at the Real Estate Term Loan 1 Default Rate may be paid from time to time, or unless a of if not sooner demanded, on the first day of each month. The provisions of this section may result in compounding of interest. The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

2.03    **Release of Guarantor.** Crystal D McClain is hereby released as of the date hereof from any and all liability for the Loan Obligations under any Note or Guaranty executed in connection with this Facility Sheet. The release set forth in this sub-section is (i) in reliance of Guarantor's, Borrower's or Party's representations, promises and other consideration to Lender for such release; and (ii) shall not be construed in any manner as an impairment of the lien of Lender under the Collateral Documents or Lender's right to otherwise collect the indebtedness secured by the Collateral Documents.

---

### ARTICLE 3 - CONDITIONS

3.01    **Conditions of the Loan.** Lender's obligation to make the Loan(s) is subject to the following conditions precedent:

(a)    Guarantor has executed and delivered to Lender a guaranty of the payment and performance of the Loan Obligations (the "Guaranty");

(b)    Lender has received a written opinion from Borrower's and Guarantor's legal counsel acceptable to Lender, covering all issues required by Lender;

(c)    No Event of Default or event which, with the passage of time or the giving of notice would constitute an Event of Default has occurred and remains uncured; and

(d)    reimbursement of Lender's out of pocket expenses, including Legal Fees and any fees and costs payable by Lender as set forth in the MCA or any amendment, modification or supplement thereto, incurred in connection with the underwriting of the Loan or the Closing.

### ARTICLE 4 - REPRESENTATIONS AND WARRANTIES

Until such time as all Obligations have been paid in full and Lender has no obligation to make any additional advances under the Loan, Borrower or the Person or Persons being one or more of the Borrowers as may be specifically named in any of the following representations and covenants) agrees to and makes the following representations and covenants:

4.01    **Master Credit Agreement Representations.** Borrower makes and confirms all of Borrower Representations set forth in the MCA.

4.02    **Entire Agreement.** This Facility Sheet and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Borrower concerning this credit; (ii) replace any prior oral or written agreements between Lender and Borrower concerning this credit; and (iii) are intended by Lender and Borrower as the final, complete and exclusive statement of the terms agreed to by them.

4.03    **Covenants.** Borrower hereby makes and agrees to be bound by all of the Covenants as set forth on Schedule 1 attached hereto and made a part hereof.

4.04    **Reporting Requirements.** Borrower hereby makes and agrees to be bound by all of the Reporting Requirements as set forth on Schedule 2 attached hereto and made a part hereof.

4.05    **Waiver of Prior Claims.** BORROWER WAIVES AND RELEASES ANY AND ALL CLAIMS AGAINST LENDER, ITS PARENT, SUBSIDIARIES, AFFILIATES AND ITS MERGED PREDECESSORS, AS SERVICES OF AMERICA, INC., THE SUBSIDIARY OF SUCH PREDECESSOR, AS ACCEPTANCE CORPORATION, AND THE RESPECTIVE SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS AND EMPLOYEES OF EACH AND ALL OF THE FOREGOING, RELATING OR PERTAINING TO ON AS A RESULT OF THE EXISTING LOANS, AND ANY OTHER ACT OR OMISSION WHICH HAS OCCURRED PRIOR TO THE EXECUTION OF THIS FACILITY SHEET, INCLUDING ALL CLAIMS OF USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, OR LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR IN CONTRACT, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

4.06    **Expenses.** The Borrower shall pay within ten (10) Business Days after demand from Lender, all costs and expenses incurred (or reimburse Lender for payment of) in connection with the preparation, execution, delivery, filing, and administration of this Facility Sheet (including, without limitation, Legal Fees incurred in connection with the preparation of this Facility Sheet and advising the Lender as to its rights, and the cost of any credit verification reports or field examinations of the Borrower's properties or books and records).

4.07    **State Specific Addendum.** The following state specific language is hereby added to this Facility Sheet as set forth on Schedule 3 attached hereto and made a part hereof.

4.08    **Counterpart Executions.** This Facility Sheet may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Facility Sheet transmitted by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Facility Sheet for all purposes; provided, however that Borrower shall promptly deliver an original signed copy of this Facility Sheet to Lender.

**BORROWER AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT:**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

MCCLAIN FEED YARD, INC., a Texas corporation

By: _____
BRIAN KEITH McCLAIN
President

The undersigned is a Guarantor pursuant to the terms of an existing Master Loan Guaranty and a Grantor of collateral pursuant to an existing Master Security Agreement from the undersigned to Lender with respect to this Facility Sheet and hereby acknowledges the terms and conditions hereof

McClain-MCA 2016
Real Estate Term Loan 1 Facility Sheet    2

---

**GUARANTOR UNDER THE MASTER GUARANTY AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT:**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

7M CATTLE FEEDERS, INC., a Kentucky corporation

By: _____
BRIAN KEITH McCLAIN
President

The undersigned is a Guarantor pursuant to the terms of an existing Master Loan Guaranty from the undersigned to Lender with respect to this Facility Sheet and hereby acknowledges the terms and conditions hereof.

**GUARANTOR UNDER THE MASTER GUARANTY:**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

MCCLAIN FARMS, INC., a Kentucky corporation

By: _____
BRIAN KEITH McCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42025

_____
BRIAN KEITH McCLAIN

**LENDER:**

Address for Notices:
14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017
Attention:  Loan Closing Department

RABO AGRIFINANCE LLC

By: _____
Name:  W G Lawhorne
Title:  VP

McClain-MCA 2016
Real Estate Term Loan 1 Facility Sheet    3

---

### SCHEDULE 1
#### Covenants

Until such time as all Obligations have been paid in full:

4.01    **Insurance.**

(a)    If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the lesser of (i) the full unpaid principal balance of the Loan, or (ii) the maximum amount available under the National Flood Insurance Program for the particular type of property, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the Loan.

McClain-MCA 2016
Real Estate Term Loan 1 Facility Sheet    4

## SCHEDULE 2

### Reporting Requirements

**2.01    Reporting Requirements.** Borrower shall furnish to Lender:

(a) promptly upon receipt, copies of all Notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Substances with regard to Borrower's property, activities, or operations, or (ii) any claim against Borrower regarding Hazardous Substances;

(b) promptly upon Borrower's request, all other books, records, statements, lists of property and accounts, budgets, forecasts, reports, records or other information pertaining to the condition or operations of Borrower or Guarantor requested by Lender.

---

## SCHEDULE 3

### STATE SPECIFIC ADDENDUM

**1.01    Insurance.**

(a) *TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE: (A) GRANTOR OR BORROWER IS REQUIRED TO (i) KEEP THE MORTGAGED PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT SPECIFIED HEREIN; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER OR OTHERWISE AS PROVIDED HEREIN; AND (iii) NAME THE BENEFICIARY AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS AS PROVIDED HEREIN; (B) SUBJECT TO THE PROVISIONS HEREOF, GRANTOR OR BORROWER MUST, IF REQUIRED BY BENEFICIARY, DELIVER TO BENEFICIARY A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) SUBJECT TO THE PROVISIONS HEREOF, IF GRANTOR OR BORROWER FAILS TO MEET ANY REQUIREMENT OF THE FOREGOING GRANTOR'S OR BORROWER'S EXPENSE.*

**1.02    INDEMNIFICATION.** BORROWER SHALL DEFEND, INDEMNIFY AND HOLD LENDER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS...

**1.03    Notice of Final Agreement.** THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**1.04    Waiver of Appraisal Rights.** Guarantor hereby agrees that:

(a) In the event an interest in any of Borrower's real property (the "Property") is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code or any successor statute (as the same may be amended from time to time)...

(b) Alternatively, in the event the waiver provided for in subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, to the fullest extent not prohibited by applicable law, the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time):

(i) the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure;

(ii) the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than six months) following the foreclosure sale;

(iii) all reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Property, including, brokerage commissions, title insurance, a survey of the Property, tax prorations, seller's attorneys' fees and marketing costs;

(iv) the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in subsection (iii) above) and other maintenance expenses; and

---

(v) any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five years' experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

**1.05    Business Loan.** Borrower acknowledges that the proceeds of the Loan are primarily for agricultural, commercial, investment or business purposes, and are not for a consumer transaction.

McClain MCA 2018
22117432

## REAL ESTATE TERM LOAN 2 NOTE

July 24, 2019

$625,000.00

FOR VALUE RECEIVED, the undersigned (individually and collectively, "Borrower"), hereby promise to pay to the order of RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") the principal sum of Six Hundred Twenty-Five Thousand Dollars and No Cents ($625,000.00) and interest at the rate specified in the Real Estate Term Loan 2 Facility Sheet between Borrower and Lender dated July 24, 2019, along with any replacements (the "Facility Sheet"). Principal and interest are payable to Lender at the times specified in the Facility Sheet. All payments shall be made to Lender in lawful money of the United States of America at 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, or such other place as Lender directs, in same day funds. Each capitalized term used in this note that is defined in the certain Master Credit Agreement between Borrower and Lender dated May 11, 2018 (the "Credit Agreement") will have the meaning specified in the Credit Agreement. This note will be interpreted in accordance with the Drafting Conventions.

This note is referred to in, and is subject to the terms and conditions of the Credit Agreement. Without limitation, the Credit Agreement contains provisions for acceleration of the maturity hereof upon the occurrence of certain stated events.

Borrower has signed this note effective as of the day and year first written above.

**BORROWER**

**7M CATTLE FEEDERS, INC.,** a Kentucky corporation

Address for Notices:
824 Mullins Lane
Benton, Kentucky 42055

By: _____
BRIAN KEITH MCCLAIN
President

By: _____
CRYSTAL D MCCLAIN
Vice President

22117432

## FACILITY SHEET
### (REAL ESTATE TERM LOAN 2)

This Facility Sheet may be amended, modified or supplemented from time to time, referred to herein as the "Facility Sheet") is dated as of July 24, 2019 and is with regard to Facility Loan No. 22117432 between 7M CATTLE FEEDERS, INC., a Kentucky corporation ("Borrower"), MCCLAIN FEED YARD, INC., a Texas corporation (MCClain Feed Yard"), McCLAIN FARMS, INC., a Kentucky corporation ("McClain Farms"), and BRIAN KEITH MCCLAIN ("Brian McClain") and CRYSTAL D'MCCLAIN ("Crystal McClain"), married spouses (McClain Feed Yard ; McClain Farms; Brian McClain; and Crystal McClain are herein individually and collectively, "Guarantor") and RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") and hereby supersedes any and all previous facility sheets that governed this obligation.

Parties and Lender have entered into a Master Credit Agreement ("Master Credit Agreement") dated May 11, 2018 which may include schedules, addendums, and exhibits thereto. The MCA incorporates by reference and includes a Schedule of Definitions and Covenants (Schedule of Definitions and Covenants") dates of even date with the MCA and any Applicable Obligor Covenant Statement. All terms, covenants, conditions and ... [illegible] ... received and reviewed the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Statement. Capitalized terms contained in this Facility Sheet are restrictions set forth in the MCA are incorporated herein by reference as if fully set forth herein. Capitalized terms contained in this Facility Sheet are used as defined in the Schedule of Definitions and Covenant and any Applicable Obligor Covenant Statement. Some or all of the capitalized terms defined in the Schedule of Definitions and Covenants are used in this Facility Sheet as defining the capitalized terms that are used in this Facility Sheet as ... Covenants are incorporated by reference into this Facility Sheet for purposes of this Facility Sheet. In the event any term is defined in the Schedule of Definitions and Covenants but is not accordance with the Schedule of Definitions and Covenants. To the extent any term is defined in the Facility Sheet, such term shall be deemed to be disregarded, of no used in this Facility Sheet or any amendment, modification or supplement pursuant to this Facility Sheet, such term shall be deemed to be disregarded, or unless meaning and without any effect. Except as otherwise defined in this Facility Sheet, the MCA or the Schedule of Definitions and Covenants, or unless the context otherwise requires, each term that is used in this Facility Sheet which is defined in Article 9 of the UCC shall have the meaning ascribed to that term in Article 9 of the UCC.

Borrower requests that Lender make a Loan pursuant to this Facility Sheet. Lender agrees to make such Loan, subject to the terms and conditions of this Facility Sheet, the MCA and the Schedule of Definitions and Covenants.

### ARTICLE 1 - PRINCIPAL LOAN TERMS

This Facility Sheet is made and entered the following Loan terms:

**1.01**   **Loan Type:**  The Loan Type being made pursuant to this Facility Sheet is as follows: Real Estate Term Loan 2

**1.02**   **Loan Amount.**  Lender shall lend Borrower the principal sum of $625,000.00.

**1.03**   **Purpose.**  the Real Estate Term Loan 2 must be used only for purchasing 410 acre feed yard and general improvements to the property.

**1.04**   **Interest Rate.**  The unpaid principal balance of the Real Estate Term Loan 2 will bear interest at the rate of 4.850% per annum, fixed for the term of the facility, but in no event shall the calculated interest rate under this section be less than zero.

**1.05**   **Required Payments; Maturity Date.**

(a)   Borrower shall pay accrued interest on the Real Estate Term Loan 2 on October 1, 2019 and on the first day of each month after the Closing Date to the Real Estate Term Loan 2 Maturity Date.

(b)   Borrower shall make equal combined payments of principal and accrued interest on the Real Estate Term Loan 2 in the amount ... [illegible] ... fully amortize the original principal amount of the Real Estate Term Loan 2 over a term of 57 Real Estate Term Loan 2 Loan Months on November 1, 2019 and the first day of each month during the period from that date to the Real Estate Term Loan 2 Maturity Date.

The unpaid principal balance of, all unpaid accrued interest on, and other charges under this Facility Sheet with respect to the Real Estate Term Loan 2, shall be paid on July 1, 2024 (the "Real Estate Term Loan 2 Maturity Date").

**1.06**   **Prepayments.**  Prepayments of the Real Estate Term Loan 2 may be made at any time without Prepayment Fee or penalty.

**1.07**   **Definition of "Loan Month".**  The term "Real Estate Term Loan 2 Loan Month" means the one month period beginning on the first day of the calendar month immediately following the Closing Date, and each successive one month period.

**1.08**   **The Real Estate Term Loan 2 Note.**  The Real Estate Term Loan 2 has been or will be evidenced by this Facility Sheet and a promissory note in a form approved by Lender (the "Real Estate Term Loan 2 Note").

### ARTICLE 2 - COVENANTS REGARDING THE LOAN TYPE MADE UNDER THIS FACILITY SHEET

**2.01**   **Prepayments Generally.**  Prepayments must be accompanied by all unpaid accrued interest on the Prepayment and all other amounts due under this Facility Sheet.  Each Prepayment of a portion of the Loan will be applied to the most recent payment of the principal due under this Facility Sheet.  If Lender receives any Prepayment which it permits to allow, Lender may amount the Prepayment principal and Lender may, as a condition of acceptance, require the payment of interest which would accrue on the amount Prepaid through the date when Lender would be obligated to accept the Prepayment, on the date the principal amount Prepaid would be due under this Agreement whichever is later.

**2.02**   **Default Rate.**  Upon the occurrence of an Event of Default, the principal balance of the Loan and, to the extent permitted by Applicable Law, all other Loan Obligations shall, from the date of the Event of Default until the date such Event of Default is cured or waived ... [illegible] ... all Loan Obligations are paid in full, bear interest at the Real Estate Term Loan 2 Default Rate.  Subject to the provisions of the Schedule of Definitions and Covenants and this Facility Sheet, the "Real Estate Term Loan 2 Default Rate" means the rate otherwise provided in the Real Estate Term Loan 2 Note plus 10.000% per annum.  Interest payable at the Real Estate Term Loan 2 Default Rate shall be paid from time to time on demand, or if not sooner demanded, on the first day of each month.  The provisions of this section will never constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

---

**2.03**   **Collateral Documents.**  The payment and performance of the Obligations are secured by the following:

(a)   A Lien in favor of Lender created under and secured by the Loan Documents.

### ARTICLE 3 - CONDITIONS

**3.01**   **Conditions of the Loan.**  Lender's obligation to make the Loan(s) is subject to the following conditions precedent:

(a)   McClain Feed Yard, McClain Farms, Brian McClain, and Crystal McClain have each executed and delivered to Lender a guaranty of the payment and performance of the Loan Obligations (McClain Feed Yard , McClain Farms, Brian McClain, and Crystal McClain are individually and collectively, "Guarantor" and the guaranty or guaranties executed by Guarantor, the "Guaranty");

(b)   No Event of Default or event which, with the passage of time or the giving of notice would constitute an Event of Default has occurred and remains uncured;

(c)   Lender's receipt of a closing fee in the amount of $750.00; and

(d)   reimbursement of Lender's out of pocket expenses, including Legal Fees and any fees and costs payable by Lender as set forth in the MCA or any amendment, modification or supplement thereto, incurred in connection with the underwriting of the Loans or the Closing.

### ARTICLE 4 - REPRESENTATIONS AND WARRANTIES

Until such time as all Obligations have been paid in full and Lender has no obligation to make any additional advance under the Loan, Borrower (or the Person or Persons being one or more of the Borrowers as may be specifically named in any of the following representations and covenants) agrees to and makes the following representations and covenants:

**4.01**   **Master Credit Agreement Representations.**  Borrower re-makes and confirms all of Borrower' Representations set forth in the MCA.

**4.02**   **Entire Agreement.**  This Facility Sheet and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Borrower concerning this credit; (ii) replace any prior oral or written agreements between Lender and Borrower concerning this credit; and (iii) are intended by Lender and Borrower as the final, complete and exclusive statement of the terms agreed to by them.

**4.03**   **Covenants.**  Borrower hereby makes and agrees to be bound by all of the Covenants as set forth on Schedule 1 attached hereto and made a part hereof.

**4.04**   **Reporting Requirements.**  Borrower hereby makes and agrees to be bound by all of the Reporting Requirements as set forth on Schedule 2 attached hereto and made a part hereof.

**4.05**   **WAIVER OF PRIOR CLAIMS.**  BORROWER WAIVES AND RELEASES ANY AND ALL CLAIMS AGAINST LENDER, ITS PARENT, SUBSIDIARIES, AFFILIATES AND ITS RESPECTIVE PREDECESSOR, AG SERVICES OF AMERICA, INC., THE SUBSIDIARY OF SUCH PREDECESSOR, AG ACCEPTANCE CORPORATION, AND THE RESPECTIVE SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS AND EMPLOYEES OF EACH AND ALL OF THE FOREGOING, RELATING OR PERTAINING TO OR AS A RESULT OF THE EXISTING LOANS, AND ANY OTHER ACT OR OMISSION WHICH HAS OCCURRED PRIOR TO THE EXECUTION OF THIS FACILITY SHEET, INCLUDING ALL CLAIMS OF USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, OR LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR IN CONTRACT, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

**4.06**   **Expenses.**  The Borrower shall pay within ten (10) Business Days after demand from Lender, all costs and expenses incurred (or reimburse Lender for payment of) in connection with the preparation, execution, delivery, filing, and administration of this Facility Sheet (including, without limitation, Legal Fees incurred in connection with the preparation of this Facility Sheet and advising the Lender as to its rights, and the cost of any credit verification reports or field examinations of the Borrower's properties or books and records).

**4.07**   **State Specific Addendum.**  The following state specific language is hereby added to this Facility Sheet as set forth on Schedule 3 attached hereto and made a part hereof.

**4.08**   **Counterpart Execution.**  This Facility Sheet may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document.  A signed copy of this Facility Sheet transmitted by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Facility Sheet for all purposes; provided, however that Borrower shall promptly deliver an original signed copy of this Facility Sheet to Lender.

### BORROWER AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT:

Address for Notices:                    7M CATTLE FEEDERS, INC.
824 Mullins Lane
Benton, Kentucky 42055                  By: _____
                                        BRIAN KEITH MCCLAIN
                                        President

                                        By: _____
                                        CRYSTAL D'MCCLAIN
                                        Vice President

The undersigned is a Guarantor pursuant to the terms of an existing Master Loan Guaranty and a Grantor of interest pursuant to an existing Master

McClain MCA 2018
Real Estate Term Loan 2 Facility Sheet                    2

---

Security Agreement from the undersigned to Lender with respect to this Facility Sheet and hereby acknowledges the terms and conditions hereof.

### GUARANTOR UNDER THE MASTER GUARANTY AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT:

Address for Notices:                    MCCLAIN FEED YARD, INC., a Texas corporation
824 Mullins Lane
Benton, KY 42055                        By: _____
                                        BRIAN KEITH MCCLAIN
                                        President

                                        By: _____
                                        CRYSTAL D'MCCLAIN
                                        Secretary

The undersigned is a Guarantor pursuant to the terms of an existing Master Loan Guaranty from the undersigned to Lender with respect to this Facility Sheet and hereby acknowledges the terms and conditions hereof.

### GUARANTOR UNDER THE MASTER GUARANTY:

Address for Notices:                    MCCLAIN FARMS, INC., a Kentucky corporation
824 Mullins Lane
Benton, KY 42055                        By: _____
                                        BRIAN KEITH MCCLAIN
                                        President

                                        By: _____
                                        CRYSTAL D'MCCLAIN
                                        Secretary

Address for Notices:
824 Mullins Lane                        _____
Benton, KY 42055                        BRIAN KEITH MCCLAIN

Address for Notices:
824 Mullins Lane                        _____
Benton, KY 42055                        CRYSTAL D'MCCLAIN

Address for Notices:                    LENDER:

14767 N. Outer 40 Rd., Suite 400        RABO AGRIFINANCE LLC
Chesterfield, MO 63017
Attention: Loan Closing Department      By: _____
                                        Name: W.B. Lawson II
                                        Title: VP

McClain MCA 2018
Real Estate Term Loan 2 Facility Sheet                    3

---

### SCHEDULE 1
### Covenants

Until such time as all Obligations have been paid in full:

(a)   **Insurance.**

(b)   If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the lesser of (i) the full unpaid principal balance of the Loan, plus Swap ... Counterparties' derivative exposure under the Hedging Agreements as calculated by Swap Counterparties, plus any prior Liens on the property securing the Loan, (ii) the total replacement value of any structure located in the flood hazard area, or (iii) the Real Estate Term Loan 2 Maximum Amount available under the National Flood Insurance Program for the particular type of property, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the Loan.

McClain MCA 2018
Real Estate Term Loan 2 Facility Sheet                    4

SCHEDULE 2
Reporting Requirements

2.01    Reporting Requirements.  Borrower shall furnish to Lender:

(a)    promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Substances with respect to Borrower's property, activities, or operations, or (ii) any claim against Borrower regarding Hazardous Substances;

(b)    promptly upon Lender's request, all other books, records, statements, lists of property and accounts, budgets, forecasts, reports, records or other information pertaining to the condition or operations of Borrower or Guarantor requested by Lender.

McClish MCA 2019
Real Estate Term Loan 2 Facility Sheet

5

---

SCHEDULE 3
STATE SPECIFIC ADDENDUM

1.01    Insurance.

TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE: (A) GRANTOR OR BORROWER IS REQUIRED TO (i) KEEP THE MORTGAGED PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT SPECIFIED HEREIN; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER OR OTHERWISE HEREIN; AND (iii) NAME THE MORTGAGEE AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS AS PROVIDED HEREIN; (B) SUBJECT TO THE PROVISIONS HEREOF, GRANTOR OR BORROWER MUST, IF REQUIRED BY BENEFICIARY, DELIVER TO BENEFICIARY A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) SUBJECT TO THE PROVISIONS HEREOF, IF GRANTOR OR BORROWER FAILS TO MEET ANY REQUIREMENT LISTED IN THE FOREGOING SUBPARTS (A) OR (B), BENEFICIARY MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF GRANTOR OR BORROWER AT GRANTOR'S OR BORROWER'S EXPENSE.

1.02    Indemnification.  BORROWER SHALL DEFEND, INDEMNIFY AND HOLD LENDER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS HARMLESS AGAINST THE INDEMNIFIED PERSONS, (I) INCURRED AS A WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE AMOUNT SPECIFIED IN A LOAN REQUEST (INCLUDING ANY FAILURE RESULTING FROM THE FAILURE TO FULFILL THE APPLICABLE CONDITIONS PRECEDENT), INCLUDING ANY LOSS OF ANTICIPATED PROFITS AND LOSSES BY REASON OF THE LIQUIDATION OR REIMPLOYMENT OF FUNDS ACQUIRED BY LENDER TO FUND THE LOAN; (II) AS A RESULT OF ITS ACTS OR OMISSIONS WHICH RESULT FROM COMMUNICATIONS GIVEN OR PURPORTED TO BE GIVEN, BY BORROWER OR ANY DESIGNATED PERSON, WHO ARE INTERRUPTED, WHICH ARE MISUNDERSTOOD, OR WHICH ARE IN FACT FROM UNAUTHORIZED PERSONS; (III) ARISING OUT OF OR RESULTING FROM THE VIOLATION BY BORROWER OF ANY ENVIRONMENTAL LAW, (IV) RESULTING FROM THE RELIANCE BY LENDER ON EACH NOTICE PURPORTEDLY GIVEN BY OR ON BEHALF OF BORROWER; (V) INCURRED BY LENDER UNDER ANY GUARANTY, INDEMNITY OR THE LIKE EXECUTED IN FAVOR OF LENDER AS A RESULT OF LENDER BEING INA LIABILITIES; AND (VI) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS. THIS INDEMNIFICATION SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO MATTERS WHICH, IN WHOLE OR IN PART, ARE CAUSED BY OR ARISE OUT OF PARTY TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED PURSUANT TO THIS AGREEMENT. THE NEGLIGENCE (WHETHER SOLE, COMPARATIVE, OR CONTRIBUTORY) OR STRICT LIABILITY OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PERSON; EXCEPT THAT BORROWER SHALL HAVE NO OBLIGATION TO AN INDEMNIFIED PERSON UNDER THIS SECTION WITH RESPECT TO LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THAT INDEMNIFIED PERSON. THE MAXIMUM CONTRIBUTION TO DETERMINED BY A COURT OF COMPETENT JURISDICTION, IF AND TO THE EXTENT THAT ANY INDEMNITY UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES IS UNENFORCEABLE FOR ANY REASON, BORROWER SHALL MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION THEREOF WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. ALL INDEMNITIES UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

1.03    Notice of Final Agreement.  THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

1.04    Waiver of Appraisal Rights.  Guarantor hereby agrees that:

(a)    In the event an interest in any of Borrower's real property (the "Property") is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code or any successor statute (as the same may be amended from time to time), and to the extent permitted by law, Lender shall be entitled to seek a deficiency judgment from Borrower, Guarantor and any other party obligated on the Note equal to the difference between the amount of the Loans secured by the Property and the amount for which the Property was sold pursuant to judicial or nonjudicial foreclosure sale.  Guarantor expressly recognizes that this paragraph constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Guarantor to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value.  Guarantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Borrower, Guarantor and others against whom recovery of a deficiency is sought.

(b)    Alternatively, in the event the waiver provided for in subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, to the fullest extent not prohibited by applicable laws, the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Section 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time):

(i)    the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure;

(ii)    the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than six months) following the foreclosure sale;

(iii)    all reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Property, including, brokerage commissions, title insurance, a survey of the Property, tax prorations, seller's attorneys' fees and marketing costs;

(iv)    the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in subsection (iii) above) and other maintenance expenses; and

McClish MCA 2019
Real Estate Term Loan 2 Facility Sheet

6

---

(v)    any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five years' experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

1.05    Business Loan.  Borrower acknowledges that the proceeds of the Loan are primarily for agricultural, commercial, investment or business purposes, and are not for a consumer transaction.

McClish MCA 2019
Real Estate Term Loan 2 Facility Sheet

7

22117432

## FACILITY SHEET
### (REAL ESTATE TERM LOAN 2)

### ARTICLE 1 – PRINCIPAL LOAN TERMS

1.01 Loan Type.

1.02 Loan Amount.

1.03 Purpose.

1.04 Interest Rate.

1.05 Required Payments; Maturity Date.

1.06 Prepayments.

1.07 Definition of "Loan Month."

1.08 The Real Estate Term Loan 2 Note.

### ARTICLE 2 – COVENANTS REGARDING THE LOAN TYPE MADE UNDER THIS FACILITY SHEET

2.01 Prepayments Generally.

2.02 Default Rate.

2.03 Release of Guarantor.

### ARTICLE 3 – CONDITIONS

3.01 Conditions of the Loan.

### ARTICLE 4 – REPRESENTATIONS AND WARRANTIES

4.01 Master Credit Agreement Representations.

4.02 Entire Agreement.

4.03 Covenants.

4.04 Reporting Requirements.

4.05 Waiver of Prior Claims.

4.06 Expenses.

4.07 State Specific Addendum.

4.08 Counterpart Execution.

### BORROWER AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT:

TM CATTLE FEEDERS, INC., a Kentucky corporation

By: _____
BRIAN KEITH McCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42055

### GUARANTOR UNDER THE MASTER GUARANTY AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT:

McCLAIN FEED YARD, INC., a Texas corporation

By: _____
BRIAN KEITH McCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42055

### GUARANTOR UNDER THE MASTER GUARANTY:

McCLAIN FARMS, INC., a Kentucky corporation

By: _____
BRIAN KEITH McCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42055

_____
BRIAN KEITH McCLAIN

Address for Notices:
824 Mullins Lane
Benton, KY 42055

### LENDER:

RABO AGRIFINANCE LLC

By: _____
Name:
Title:

14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017
Attention: Loan Closing Department

### SCHEDULE 1
### Covenants

1. Insurance.

McClain MCA 2018
Real Estate Term Loan 2 Facility Sheet

## SCHEDULE 2

### Reporting Requirements

**2.01  Reporting Requirements.** Borrower shall furnish to Lender:

(a)  promptly upon receipt, copies of all Notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Substances with regard to Borrower's property, activities, or operations, or (ii) any claim against Borrower regarding Hazardous Substances;

(b)  promptly upon Lender's request, all other books, records, statements, lists of property and accounts, budgets, forecasts, reports, records or other information pertaining to the condition or operations of Borrower or Guarantor requested by Lender.

## SCHEDULE 3
## STATE SPECIFIC ADDENDUM

**1.01  Insurance.**

(a)  *TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE: (A) GRANTOR OR BORROWER IS REQUIRED TO (i) KEEP THE MORTGAGED PROPERTY INSURED AGAINST DAMAGE IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER OR COVERAGE AS PROVIDED HEREIN; (B) SUBJECT TO THE PROVISIONS HEREOF, GRANTOR OR BORROWER MAY FURNISH THE REQUIRED INSURANCE WHETHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY GRANTOR OR BORROWER...*

**1.02  INDEMNIFICATION.** BORROWER SHALL DEFEND, INDEMNIFY AND HOLD LENDER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS...

**1.03  Notice of Final Agreement.** THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**1.04  Waiver of Appraisal Rights.** Guarantor hereby agrees that:

(a)  In the event an Event in any of Borrower's real property (the "Property") is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale...

(b)  Alternatively, in the event the waiver provided for in subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, to the fullest extent not prohibited by applicable law, the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time):

(i)  the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure;

(ii)  the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than months) following the foreclosure sale;

(iii)  all reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Property, including, brokerage commissions, title insurance, a survey of the Property, tax prorations, seller's attorneys' fees and marketing costs;

(iv)  the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in subsection (iii) above) and other maintenance expenses; and

(v)  any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five years' experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

**1.05  Business Loan.** Borrower acknowledges that the proceeds of the Loan are primarily for agricultural, commercial, investment or business purposes, and are not for a consumer transaction.

McClain MCA 2018

0000030687

### REAL ESTATE TERM LOAN 3 NOTE

August 27, 2021

$1,019,800.00

FOR VALUE RECEIVED, the undersigned (individually and collectively, "Borrower"), hereby promise to pay to the order of RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") the principal sum of One Million Nineteen Thousand Eight Hundred Dollars and No Cents ($1,019,800.00) and interest at the rate specified in the Real Estate Term Loan 3 Facility Sheet between Borrower and Lender dated August 27, 2021, along with any replacements (the "Facility Sheet").  Principal and interest are payable to Lender at the times specified in the Facility Sheet.  All payments shall be made to Lender in lawful money of the United States of America at 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, or such other place as Lender directs, in same day funds.  Each capitalized term used in this note that is defined in the certain Master Credit Agreement between Borrower and Lender dated May 11, 2018 (the "Credit Agreement") will have the meaning specified in the Credit Agreement.  This note will be interpreted in accordance with the Drafting Conventions.

This note is referred to in, and is subject to the terms and conditions of the Credit Agreement.  Without limitation, the Credit Agreement contains provisions for acceleration of the maturity hereof upon the occurrence of certain stated events.

Borrower has signed this note effective as of the day and year first written above.

**BORROWER**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

BRIAN KEITH MCCLAIN

000003687

## FACILITY SHEET

(REAL ESTATE TERM LOAN 3)

This Facility Sheet (as may be amended, modified or supplemented from time to time, referred to herein as this "Facility Sheet") is dated as of August 27, 2021 and is with regard to Facility Loan No. 000003687 between BRIAN KEITH MCCLAIN, a married person and member of a civil union or domestic partnership ("Borrower"), MCCLAIN FEED YARD, INC., a Texas corporation ("McClain Feed Yard"), MCCLAIN FARMS, INC., a Kentucky corporation ("McClain Farms") and 7M CATTLE FEEDERS, INC., a Kentucky corporation ("7M Cattle Feeders") (McClain Feed Yard, McClain Farms, and 7M Cattle Feeders are herein individually and collectively, "Guarantor") and RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") and hereby supersedes any and all previous facility sheets that governed this obligation.

Parties and Lender have entered into a Master Credit Agreement ("MCA") dated May 11, 2018 which may include schedules, addendums, and exhibits thereto. The MCA incorporates by reference and includes a Schedule of Definitions and Covenants ("Schedule of Definitions and Covenants") dated of even date with the MCA and any Applicable Obligor Covenant Schedule. Borrower and Guarantor agree that Borrower and Guarantor have received and reviewed the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. All terms, covenants, conditions and restrictions set forth in the MCA are incorporated herein by reference as if fully set forth herein. Capitalized terms contained in this Facility Sheet are used as defined in the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. Some or all of the capitalized terms defined in the Schedule of Definitions and Covenants are used in this Facility Sheet as so defined and the term of such Schedule of Definitions and Covenants are incorporated by reference into this Facility Sheet. To the extent any term is defined in the Schedule of Definitions and Covenants but is not used in this Facility Sheet or any amendment, modification or supplement to this Facility Sheet, such term shall be deemed to be disregarded, of no meaning and without any effect. Except as otherwise defined in this Facility Sheet, the MCA or the Schedule of Definitions and Covenants or unless the context otherwise requires, each term that is used in this Facility Sheet which is defined in Article 9 of the UCC shall have the meaning ascribed to that term in Article 9 of the UCC.

Borrower requests that Lender make a Loan pursuant to this Facility Sheet. Lender agrees to make such Loan, subject to the terms and conditions of this Facility Sheet, the MCA and the Schedule of Definitions and Covenants.

### ARTICLE 1 - PRINCIPAL LOAN TERMS

This Facility Sheet is made and entered on the following loan terms:

1.01   **Loan Type.** The Loan Type being made pursuant to this Facility Sheet is as follows: Real Estate Term Loan 3

1.02   **Loan Amount.** Lender shall lend or has loaned Borrower the original principal amount of $1,019,800.00.

1.03   **Purpose.** The Real Estate Term Loan 3 must be used only for refinancing existing real estate term debt with Community Financial Services Bank.

1.04   **Interest Rate.** The unpaid principal balance of the Real Estate Term Loan 3 will bear interest at the rate of 4.060% per annum, fixed for the term of the facility, but in no event shall the calculated interest rate under this section be less than zero.

1.05   **Required Payments; Maturity Date.** The unpaid principal balance of the Real Estate Term Loan 3 shall be due on November 1, 2031 and on the first day of each month after the Closing Date to the Real Estate Term Loan 3 Maturity Date.

      (a)   Borrower shall pay accrued interest on the Real Estate Term Loan 3 will bear interest on November 1, 2031 and on the first day of each month after the Closing Date to the Real Estate Term Loan 3 Maturity Date.

      (b)   Borrower shall make equal combined payments of principal and accrued interest on the Real Estate Term Loan 3 in an amount calculated to fully amortize the original principal amount of the Real Estate Term Loan 3 over a term of 120 Real Estate Term Loan 3 Loan Months on December 1, 2021 and the first day of each month during the period from that date to the Real Estate Term Loan 3 Maturity Date.

      (c)   The unpaid principal balance of, all unpaid accrued interest on, and other charges under this Facility Sheet with respect to the Real Estate Term Loan 3, shall be paid in full on August 1, 2031 (the "Real Estate Term Loan 3 Maturity Date").

1.06   **Prepayments.** Prepayments of the Real Estate Term Loan 3 may be made at any time without Prepayment Fee or penalty.

1.07   **Definition of "Loan Month."** The term "Real Estate Term Loan 3 Loan Month" means the one month period beginning on the first day of the calendar month immediately following the Closing Date, and each successive one month period.

1.08   **The Real Estate Term Loan 3 Note.** The Real Estate Term Loan 3 has been or will be evidenced by this Facility Sheet and a promissory note in a form provided by Lender (the "Real Estate Term Loan 3 Note").

### ARTICLE 2 - COVENANTS REGARDING THE LOAN TYPE MADE UNDER THIS FACILITY SHEET

2.01   **Prepayments Generally.** Prepayments must be accompanied by all unpaid accrued interest on the Prepayment and all other amounts due under this Facility Sheet. Each Prepayment of a portion of the Loan will be applied to the most recent payment of the principal due under this Facility Sheet. If Lender receives any Prepayment which is permitted to refuse, Lender may accept the Prepayment, except that Lender may, as a condition of acceptance, require the payment of interest which would accrue on the amount Prepaid through the date when Lender would be obligated to accept the Prepayment, or the date the principal amount Prepaid would be due under this Facility Sheet, whichever is earlier.

2.02   **Default Rate.** Upon the occurrence of an Event of Default, the principal balance of the Loan and, to the extent permitted by Applicable Law, all other Loan Obligations shall, from the date of the Event of Default until the Loan Obligation is waived or cured or all Loan Obligations are paid in full, bear interest at the Real Estate Term Loan 3 Default Rate. Subject to the provisions of the Schedule of Definitions and Covenants and this Facility Sheet, the "Real Estate Term Loan 3 Default Rate" means the rate applicable to the unpaid principal balance of the Real Estate Term Loan 3 plus 10.000% per annum. Interest payable at the Real Estate Term Loan 3 Default Rate shall be paid from time to time on demand, or if not sooner demanded, on the first day of each month. The provisions of this section may result in compounding of interest. The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

Address for Notices:
MCCLAIN FARMS, INC., a Kentucky corporation
824 Mullins Lane
Benton, KY 42025
                    By: _____
                        BRIAN KEITH MCCLAIN
                        President

Address for Notices:
7M CATTLE FEEDERS, INC., a Kentucky corporation
824 Mullins Lane
Benton, KY 42025
                    By: _____
                        BRIAN KEITH MCCLAIN
                        President

LENDER:
Address for Notices:           RABO AGRIFINANCE LLC
14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017         By: _____
Attention: Loan Closing Department    Name: W.R. Lansom, III
                                       Title: VP

---

### ARTICLE 3 - CONDITIONS

3.01   **Conditions of the Loan.** Lender's obligation to make the Loan(s) is subject to the following conditions precedent:

      (a)   Guarantor has executed and delivered to Lender a guaranty of the payment and performance of the Loan Obligations (the "Guaranty");

      (b)   Lender has received a written opinion from Borrower's and Guarantor's legal counsel acceptable to Lender, covering all issues required by Lender;

      (c)   Lender's receipt of a closing fee in the amount of $1,000.00; and

      (d)   reimbursement of Lender's out of pocket expenses, including Legal Fees and any fees and costs payable by Lender as set forth in the MCA or any amendment, modification or supplement thereto, incurred in connection with the underwriting of the Loans or the Closing.

### ARTICLE 4 - REPRESENTATIONS AND WARRANTIES

Until such time as all Obligations have been paid in full and Lender has no obligation to make any additional advance under the Loan, Borrower (or the Person or Persons being one or more of the Borrowers as may be specifically named in any of the following representations and covenants) agrees to and makes the following representations and covenants:

4.01   **Master Credit Agreement Representations.** Borrower remakes and confirms all of Borrower Representations set forth in the MCA.

4.02   **Entire Agreement.** This Facility Sheet and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Borrower concerning this credit; (ii) replace any prior oral or written agreements between Lender and Borrower concerning the credit; and (iii) are intended by Lender and Borrower as the final, complete and exclusive statement of the terms agreed to by them.

4.03   **Covenants.** Borrower hereby makes and agrees to be bound by all of the Covenants as set forth on Schedule 1 attached hereto and made a part hereof.

4.04   **Reporting Requirements.** Borrower hereby makes and agrees to be bound by all of the Reporting Requirements as set forth on Schedule 2 attached hereto and made a part hereof.

4.05   **WAIVER OF PRIOR CLAIMS.** BORROWER WAIVES AND RELEASES ANY AND ALL CLAIMS AGAINST LENDER, ITS PARENT, SUBSIDIARIES, AFFILIATES AND ITS MERGED PREDECESSOR, AG SERVICES OF AMERICA, INC., THE SUBSIDIARY OF SUCH PREDECESSOR, AND ALL OF THE RESPECTIVE SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS AND EMPLOYEES OF EACH AND AG ACCEPTANCE CORPORATION, AND THE RESPECTIVE SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS AND EMPLOYEES OF EACH AND ALL OF THE FOREGOING, RELATING OR PERTAINING TO OR AS A RESULT OF THE EXISTING LOANS, AND ANY OTHER ACT OR OMISSION WHICH HAS OCCURRED PRIOR TO THE EXECUTION OF THIS FACILITY SHEET, INCLUDING ALL CLAIMS OF USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, OR LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR IN CONTRACT, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

4.06   **Expenses.** The Borrower shall pay within ten (10) Business Days after demand from Lender, all costs and expenses incurred (or reimburse Lender for payment of) in connection with the preparation, execution, delivery, filing, and administration of this Facility Sheet (including, without limitation, Legal Fees incurred in connection with the preparation of this Facility Sheet and advising the Lender as to its rights, and the cost of any credit verification reports or field examinations of the Borrower's properties or books and records).

4.07   **State Specific Addendum.** The following state specific language is hereby added to this Facility Sheet as set forth on Schedule 3 attached hereto and made a part hereof.

4.08   **Counterpart Execution.** This Facility Sheet may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. The counterparts of this Facility Sheet may be executed by electronic signature and delivered by email or facsimile, so long as each method of execution and delivery is acceptable to Lender in Lender's sole discretion.

BORROWER:
                    _____
                    BRIAN KEITH MCCLAIN

The undersigned is a Guarantor pursuant to the terms of an existing Master Loan Guaranty and a Grantor of collateral pursuant to an existing Master Security Agreement from the undersigned with respect to this Facility Sheet and hereby acknowledges the terms and conditions hereof.

GUARANTOR UNDER THE MASTER GUARANTY AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT:

MCCLAIN FEED YARD, INC., a Texas corporation

                    By: _____
                        BRIAN KEITH MCCLAIN
                        President

---

### SCHEDULE 1

#### Covenants

Until such time as all Obligations have been paid in full:

1.01   **Insurance.**

      (a)   If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the lesser of 1) the full unpaid principal balance of the Loan, 2) the total replacement value of any structure located in the flood hazard area or 3) the maximum amount available under the National Flood Insurance Program for the particular type of property, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the Loan.

SCHEDULE 2

Reporting Requirements

2.01    Reporting Requirements.  Borrower shall furnish to Lender:

(a)    promptly upon receipt, copies of all Notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Substances with regard to Borrower's property, activities, or operations, or (ii) any claim against Borrower regarding Hazardous Substances;

(b)    promptly upon Lender's request, all other books, records, statements, lists of property and accounts, budgets, forecasts, reports, records or other information pertaining to the condition or operations of Borrower or Guarantor requested by Lender.

---

SCHEDULE 3
STATE SPECIFIC ADDENDUM

1.01    Insurance.  **TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE:  (A) GRANTOR OR BORROWER IS REQUIRED (i) TO KEEP THE MORTGAGED PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT SPECIFIED HEREIN; (ii) TO PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER OR COVERAGE AS PROVIDED HEREIN; AND (iii) NAME THE BENEFICIARY AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS AS PROVIDED HEREIN; (B) SUBJECT TO THE PROVISIONS HEREOF, GRANTOR OR BORROWER MUST, IF REQUIRED BY BENEFICIARY, DELIVER TO BENEFICIARY A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) SUBJECT TO THE PROVISIONS HEREOF, IF GRANTOR OR BORROWER FAILS TO MEET ANY REQUIREMENT LISTED IN THE FOREGOING SUBPARTS (A) OR (B), BENEFICIARY MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF GRANTOR OR BORROWER AT GRANTOR'S OR BORROWER'S EXPENSE.**

1.02    Indemnification.  BORROWER SHALL DEFEND, INDEMNIFY AND HOLD LENDER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS: (i) INCURRED AS A RESULT OF THE FAILURE BY BORROWER TO BORROW THE AMOUNT SPECIFIED IN A LOAN REQUEST (INCLUDING ANY FAILURE RESULTING FROM THE REASON OF THE LIQUIDATION OR REEMPLOYMENT OF FUNDS ACQUIRED BY LENDER TO FUND THE LOAN); (ii) AS A RESULT OF ITS ACTS OR OMISSIONS WHICH RESULT FROM COMMUNICATIONS GIVEN OR PURPORTED TO BE GIVEN, BY BORROWER OR ANY DESIGNATED PERSON, WHICH ARE INTERRUPTED, WHICH ARE MISUNDERSTOOD, OR WHICH ARE IN FACT FROM UNAUTHORIZED PERSONS; (iii) ARISING OUT OF OR RESULTING FROM THE VIOLATION BY BORROWER OF ANY ENVIRONMENTAL LAW; (iv) RESULTING FROM THE RELIANCE BY LENDER ON EACH NOTICE PURPORTEDLY GIVEN BY OR ON BEHALF OF BORROWER; (v) INCURRED BY LENDER UNDER ANY GUARANTY, INDEMNITY ON THE LIKE GIVEN TO COUNTERPARTY, WITH RESPECT TO INDEMNIFIED PERSONS AS A RESULT OF COUNTERPARTY LIABILITIES; AND (vi) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS PURSUANT TO THIS AGREEMENT, THIS LENDER BEING PARTY TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED PURSUANT TO THIS AGREEMENT. THIS INDEMNIFICATION SHALL APPLY TO EACH INDEMNITEE'S PERSON WITH RESPECT TO MATTERS WHICH, IN WHOLE OR IN PART, ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE (WHETHER SOLE, COMPARATIVE, OR CONTRIBUTORY) OR STRICT LIABILITY OF SUCH INDEMNIFIED PERSON, EXCEPT THAT BORROWER SHALL HAVE NO OBLIGATION TO AN INDEMNIFIED PERSON (AND/OR ANY OTHER) INDEMNIFIED PERSON, WITH RESPECT TO LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THAT INDEMNIFIED PERSON AS DETERMINED BY A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THAT ANY INDEMNITY UNDER THIS SECTION MAY BE UNENFORCEABLE BY A COURT OF COMPETENT JURISDICTION, BORROWER SHALL MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION THEREOF WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. ALL INDEMNITIES UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES IS UNENFORCEABLE FOR ANY REASON, BORROWER SHALL MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION THEREOF WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. ALL INDEMNITIES UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

1.03    Notice of Final Agreement.  THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

1.04    Waiver of Appraisal Right.  Guarantor hereby agrees that:

(a)    In the event an interest in any of Borrower's real property (the "Property") is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code or any successor statute (as the same may be amended from time to time), and to the extent permitted by law, Lender shall be entitled to seek a deficiency judgment from Borrower, Guarantor and any other party obligated on the Note equal to the difference between the amount of the Loans secured by the Property and the amount for which the Property was sold pursuant to judicial or nonjudicial foreclosure sale.  Guarantor expressly recognizes that this paragraph constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Borrower, Guarantor and other persons against whom recovery of deficiencies is sought to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value.  Guarantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Borrower, Guarantor and others against whom recovery of a deficiency is sought.

(b)    Alternatively, in the event the waiver provided for in subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, to the fullest extent not prohibited by applicable law, the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time):

(i)    the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure;

(ii)    the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than six months) following the foreclosure sale;

(iii)    all reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Property, including, brokerage commissions, title insurance, a survey of the Property, tax prorations, seller's attorneys' fees and marketing costs;

(iv)    the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in subsection (iii) above) and other maintenance expenses; and

---

any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five years' experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

1.05    Business Loan.  Borrower acknowledges that the proceeds of the Loan are primarily for agricultural, commercial, or business purposes, and are not for a consumer transaction.

McClain MCA 2018

0000030682

### OPERATING LINE OF CREDIT 3 NOTE

August 27, 2021

$45,000,000.00

FOR VALUE RECEIVED, the undersigned (individually and collectively, "Borrower"), hereby promise to pay to the order of RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") the principal sum of Forty-Five Million Dollars and No Cents ($45,000,000.00) or, if less, the aggregate principal sum of all Operating Line of Credit 3 Loans, and interest at the rate specified in the Operating Line of Credit 3 Facility Sheet between Borrower and Lender dated August 27, 2021, along with any replacements (the "Facility Sheet"). Principal and interest are payable to Lender at the times specified in the Facility Sheet. All payments shall be made to Lender in lawful money of the United States of America at 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, or such other place as Lender directs, in same day funds. Each capitalized term used in this note that is defined in the certain Master Credit Agreement between Borrower and Lender dated May 11, 2018 (the "Credit Agreement") will have the meaning specified in the Credit Agreement. This note will be interpreted in accordance with the Drafting Conventions.

This note is referred to in, and is subject to the terms and conditions of the Credit Agreement. Without limitation, the Credit Agreement (i) provides for the making of Operating Line of Credit 3 Loans by Lender to Borrower from time to time in an aggregate amount not to exceed at any time outstanding the amount specified above, and (ii) contains provisions for acceleration of the maturity hereof upon the occurrence of certain stated events.

Borrower has signed this note effective as of the day and year first written above.

### BORROWER

Address for Notices:
824 Mullins Lane
Benton, KY 42025

MCCLAIN FEED YARD, INC., a Texas corporation

By: _____
BRIAN KEITH MCCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42025

MCCLAIN FARMS, INC., a Kentucky corporation

By: _____
BRIAN KEITH MCCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42055

7M CATTLE FEEDERS, INC, a Kentucky corporation

By: _____
BRIAN KEITH MCCLAIN
President

McClain MCA 2018

22122952

## <u>AMENDED AND RESTATED OPERATING LINE OF CREDIT 3 NOTE</u>

July 14, 2022

$48,000,000.00

FOR VALUE RECEIVED, the undersigned (individually and collectively, "<u>Borrower</u>"), hereby promise to pay to the order of RABO AGRIFINANCE LLC, a Delaware limited liability company ("<u>Lender</u>") the principal sum of Forty-Eight Million Dollars and No Cents ($48,000,000.00) or, if less, the aggregate principal sum of all Operating Line of Credit 3 Loans, and interest at the rate specified in the Operating Line of Credit 3 Facility Sheet between Borrower and Lender dated July 14, 2022, along with any replacements (the "<u>Facility Sheet</u>").  Principal and interest are payable to Lender at the times specified in the Facility Sheet.  All payments shall be made to Lender in lawful money of the United States of America at 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, or such other place as Lender directs, in same day funds.  Each capitalized term used in this note that is defined in the certain Master Credit Agreement between Borrower and Lender dated May 11, 2018 (the "<u>Credit Agreement</u>") will have the meaning specified in the Credit Agreement.  This Amended and Restated Operating Line of Credit 3 Note amends and restates that certain Operating Line of Credit 3 Note dated August 27, 2021 in the principal amount of $45,000,000.00  This note will be interpreted in accordance with the Drafting Conventions.

This note is referred to in, and is subject to the terms and conditions of the Credit Agreement.  Without limitation, the Credit Agreement (i) provides for the making of Operating Line of Credit 3 Loans by Lender to Borrower from time to time in an aggregate amount not to exceed at any time outstanding the amount specified above, and (ii) contains provisions for acceleration of the maturity hereof upon the occurrence of certain stated events.

Borrower has signed this note effective as of the day and year first written above.

### BORROWER

**Address for Notices:**

824 Mullins Lane
Benton, KY 42025

**MCCLAIN FEED YARD, INC.**, a Texas corporation

By: _____
　　BRIAN KEITH MCCLAIN
　　President

**Address for Notices:**

824 Mullins Lane
Benton, KY 42025

**MCCLAIN FARMS, INC.**, a Kentucky corporation

By: _____
　　BRIAN KEITH MCCLAIN
　　President

**Address for Notices:**

824 Mullins Lane
Benton, KY 42055

**7M CATTLE FEEDERS, INC**, a Kentucky corporation

By: _____
　　BRIAN KEITH MCCLAIN
　　President

DocuSign Envelope ID: 96B0E0D9-FC32-46F8-8EED-758E4C1E467B

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian
McClain MCA 2018

22122952

## OPERATING LINE OF CREDIT 3 NOTE

January 13, 2023

$54,000,000.00

FOR VALUE RECEIVED, the undersigned (individually and collectively, "Borrower"), hereby promise to pay to the order of RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") the principal sum of Fifty-Four Million Dollars and No Cents ($54,000,000.00) or, if less, the aggregate principal sum of all Operating Line of Credit 3 Loans, and interest at the rate specified in the Operating Line of Credit 3 Facility Sheet between Borrower and Lender dated January 13, 2023, along with any replacements (the "Facility Sheet"). Principal and interest are payable to Lender at the times specified in the Facility Sheet. All payments shall be made to Lender in lawful money of the United States of America at 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, or such other place as Lender directs, in same day funds. Each capitalized term used in this note that is defined in the the certain Master Credit Agreement between Borrower and Lender dated May 11, 2018 (the "Credit Agreement") will have the meaning specified in the Credit Agreement. This Operating Line of Credit 3 Note amends and restates that certain Amended and Restated Operating Line of Credit 3 Note dated July 14, 2022 in the face principal amount of $48,000,000.00 This note will be interpreted in accordance with the Drafting Conventions.

This note is referred to in, and is subject to the terms and conditions of the Credit Agreement. Without limitation, the Credit Agreement (i) provides for the making of Operating Line of Credit 3 Loans by Lender to Borrower from time to time in an aggregate amount not to exceed at any time outstanding the amount specified above, and (ii) contains provisions for acceleration of the maturity hereof upon the occurrence of certain stated events.

Borrower has signed this note effective as of the day and year first written above.

### BORROWER

Address for Notices:

824 Mullins Lane
Benton, KY 42025

**MCCLAIN FEED YARD, INC.**, a Texas corporation

By: _Brian Keith McClain_
A7AAE79C2FBC4EF...
BRIAN KEITH MCCLAIN
President

Address for Notices:

824 Mullins Lane
Benton, KY 42025

**MCCLAIN FARMS, INC.**, a Kentucky corporation

By: _Brian Keith McClain_
A7AAE79C2FBC4EF...
BRIAN KEITH MCCLAIN
President

Address for Notices:

824 Mullins Lane
Benton, KY 42055

**7M CATTLE FEEDERS, INC.**, a Kentucky corporation

By: _Brian Keith McClain_
A7AAE79C2FBC4EF...
BRIAN KEITH MCCLAIN
President

COPY VIEW

000010682

**FACILITY SHEET**

(OPERATING LINE OF CREDIT 3)

This Facility Sheet (as may be amended, modified or supplemented from time to time, referred to herein as this "Facility Sheet") is dated as of August 27, 2021 with respect to Facility Sheet No. 000008682 between MCCLAIN FEED YARD, INC., a Texas corporation ("McClain Feed Yard"); MCCLAIN FARMS, INC., a Kentucky corporation ("McClain Farms"); and TM CATTLE FEEDERS, INC., a Kentucky corporation ("TM Cattle Feeders") (McClain Feed Yard, McClain Farms; and TM Cattle Feeders are herein individually and collectively, "Borrower"), BRIAN KEITH MCCLAIN, a married person or member of a civil union or domestic partnership ("Guarantor") and RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") and hereby supersedes any and all previous facility sheets that governed this obligation.

Parties and Lender have entered into a Master Credit Agreement ("MCA") dated May 11, 2018 which may include schedules, addendums, and exhibits thereto. The MCA incorporates by reference and includes a Schedule of Definitions and Covenants (Schedule of Definitions and Covenants") dated of even date with the MCA and any Applicable Obligor Covenant Schedule, and Borrower and Guarantor agree that Borrower and Guarantor have received and reviewed the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. All terms, covenants, conditions and restrictions set forth in the Schedule of Definitions and Covenants as incorporated herein by reference as if fully set forth herein. Capitalized terms contained in this Facility Sheet are used as defined in the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. Some of the terms of this Schedule of Definitions are defined in the Schedule of Definitions and Covenants are used in this Facility Sheet as so defined and the terms of such Schedule of Definitions and Covenants are incorporated by reference into this Facility Sheet for purposes of such capitalized terms that are used in this Facility Sheet in accordance with the Schedule of Definitions and Covenants. To the extent any term is defined in the Schedule of Definitions and Covenants but is not used in this Facility Sheet or any amendment, modification or supplement to this Facility Sheet, such term shall be deemed to be disregarded, of no meaning and without any effect. Except as otherwise defined in this Facility Sheet, the MCA or in the Schedule of Definitions and Covenants, or unless the context otherwise requires, each term that is used in this Facility Sheet which is defined in Article II of the UCC shall have the meaning assigned to that term in Article II of the UCC.

Borrower requests that Lender make a Loan pursuant to this Facility Sheet. Lender agrees to make such Loan, subject to the terms and conditions of this Facility Sheet, the MCA and the Schedule of Definitions and Covenants.

**ARTICLE 1 – PRINCIPAL LOAN TERMS**

This Facility Sheet is made and entered on the following Loan terms:

1.01    **Loan Type.** The Loan Type being made pursuant to this Facility Sheet is as follows: Operating Line of Credit 3.

1.02    **The Operating Line of Credit 3.** Lender shall extend credit from time to time during the period from the Closing Date to the Operating Line of Credit 3 Maturity Date (that period, including extensions, if any, the "Operating Line of Credit 3 Advance Period") by making Loans to Borrower (each such loan) on a revolving basis.

1.03    **Maximum Amount.** The aggregate unpaid principal balance of the Operating Line of Credit 3 must not exceed the lesser of: (a) $45,000,000.00 or (b) the Operating Line of Credit 3 Borrowing Base ("Operating Line of Credit 3 Maximum Amount").

1.04    **Borrowing Base.**

(a)    "Operating Line of Credit 3 Borrowing Base" means the sum of:

(i)        80% of Eligible Accounts Receivable; plus
(ii)       75% of the Eligible Value of Eligible Cattle; plus
(iii)      80% of the Value of Eligible Cattle Down Payments; plus
(iv)      100% of Eligible Commodity Hedge Accounts; plus
(v)       100% of the Eligible Demand Deposit Accounts; plus
(vi)      75% of the Value of Eligible Feed and Grain Inventory; plus
(vii)     65% of the Eligible Cattle Value of Eligible Hedged Cattle; plus
(viii)    100% of Eligible Investment in Growing Crops; plus
(ix)      100% of Eligible Packer Accounts Receivable; plus
(x)       80% of the Eligible Cattle Value of Eligible Option Protected Cattle; plus
(xi)      80% of Eligible Prepaid Feed and Input Expenses; plus
(xii)     100% of the Eligible Cattle Value of Eligible Placement Cattle; minus
(xiii)    100% Related Payables and Liabilities; minus
(xiv)    100% Book Overdraft/Outstanding Pending Transactions
(xv)     100% of Cattle Deposits Received

(b)    The Operating Line of Credit 3 Borrowing Base for purposes of the initial Loan will be determined by the most recent Borrowing Base Certificate received by Lender, subject however, to adjustments by Lender consistent with this agreement. The Operating Line of Credit 3 Borrowing Base for purposes of subsequent Loans will be determined by Borrower, subject however, to adjustments by Lender consistent with this agreement. Each Loan Request for the Loan will be deemed a representation by Borrower that the unpaid principal balance of the Line of credit after the requested Loan will not exceed the maximum amount of the Line of credit under this agreement. Notwithstanding the provisions of this section to the contrary, Lender may as a precondition to any Loan require Borrower to deliver to Lender a current Borrowing Base Certificate.

1.05    **Loans under the Operating Line of Credit 3.** Loans under the Operating Line of Credit 3 are subject to Article 3 below. The Operating Line of Credit 3 Loan must be used only for funding the operations of McClain Feed Yard, Inc., TM Cattle Feeders, Inc., and McClain Farms, Inc.

1.06    **Revolving Nature.** The Operating Line of Credit 3 is a Revolving Line of Credit, and during the Operating Line of Credit 3 Advance Period, subject to the terms and conditions of this Facility Sheet, Borrower may repay principal amounts and reborrow them.

1.07    **Interest Rate.** The unpaid principal balance of Loans under the Operating Line of Credit 3 shall bear interest at a rate equal to the one month LIBOR plus 2.750% per annum. Adjusted on the first day of each month but in no event shall the calculated interest rate under this section be less than zero.

1.08    **Required Payments; Maturity Date.**

(a)    Borrower shall pay accrued interest on the Operating Line of Credit 3 on November 1, 2021 and on the first day of each February, May, August and November after the Closing Date to the Operating Line of Credit 3 Maturity Date.

(b)    The unpaid principal balance of, all unpaid accrued interest on, and other charges under this Facility Sheet with respect to the Operating Line of Credit 3, shall be paid on August 1, 2022 (the "Operating Line of Credit 3 Maturity Date").

1.09    **Prepayments.** Prepayments of the Operating Line of Credit 3 may be made at any time without Prepayment Fee or penalty.

1.10    **The Operating Line of Credit 3 Note.** Loans under the Operating Line of Credit 3 have been or will be evidenced by this Facility Sheet and a promissory note in a form provided by Lender (the "Operating Line of Credit 3 Note").

**ARTICLE 2 – COVENANTS REGARDING THE LOAN TYPE MADE UNDER THIS FACILITY SHEET**

2.01    **Loan Amounts.** Each loan will be made upon the request of Borrower. Each Loan Request (x) must comply with the notice requirements of Article 9 of the MCA; (b) at Lender's option, must be received by Lender before 12:00 noon (St. Louis, Missouri time) on a Business Day which is not less than one Business day prior to the date of the Loan; and (c) must specify the amount of the Loan. No Loan will be made if the Interest Rate for that Loan would exceed the Maximum Rate. With the exception of the Operating Line of Credit 3 Maximum Amount under the terms of this Facility Sheet. Each Loan Request will be irrevocable. Notwithstanding the provisions of this section to the contrary, Lender may approve a Loan Request without a Loan Request and meeting the requirements of this Maximum Amount under the terms of this Facility Sheet. If Lender approves such Loan, bear interest at the rate otherwise applicable to a Loan made pursuant to Sheet. Each Permitted Over Advance will, unless otherwise agreed by Lender, bear interest at the rate otherwise applicable to a Loan made pursuant to such Loan Request, and be subject to the provisions of Section 3.03 of the MCA requiring payment of principal and interest and interest upon demand and all other terms and provisions of this Facility Sheet otherwise applicable to such Loan.

2.02    **Prepayments Generally.** Borrower shall have the option of making any Prepayment subject to payment of all amounts then due Lender under this Facility Sheet. Each Prepayment of a portion of the Loan will be applied to the most remote payment of the principal due under this Facility Sheet. If Lender receives any Prepayment which it is permitted to refuse, Lender may accept the Prepayment, except that Lender may, as a condition of acceptance, require the payment of interest which would accrue on the amount Prepaid through the date when Lender would be obligated to accept the Prepayment, or else the principal amount Prepaid would be due under this Facility Sheet, whichever is earlier.

2.03    **Default Rate.** Upon the occurrence of an Event of Default, the principal balance of the Loan and, to the extent permitted by Applicable Law, all other Loan Obligations shall, from the date of the Event of Default until the date Lender notifies Borrower that it is waived or cured or all Loan Obligations are paid in full, bear interest at the Operating Line of Credit 3 Default Rate. The provisions of the Schedule of Definitions and Covenants and this Facility Sheet, the "Operating Line of Credit 3 Default Rate" means the rate applicable to be unpaid principal balance of the Operating Line of Credit 3 plus 10.000% per annum. Interest payable at the Operating Line of Credit 3 Default Rate shall be paid from time to time on demand, or if not sooner demanded, on the first day of each month. The provisions of this section may result in compounding of interest. The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

**ARTICLE 3 – CONDITIONS**

3.01    **Conditions of the Loan.** Lender's obligation to make the Loan(s) is subject to the following conditions precedent:

(a)    Guarantor has executed and delivered to Lender a guaranty of payment and performance of the Loan Obligations (the "Guaranty");

(b)    Lender has received a Borrowing Base Certificate;

(c)    Lender has received a written opinion from Borrower's and Guarantor's legal counsel acceptable to Lender, covering all issues required by Lender;

(d)    Lender's receipt of a closing fee in the amount of $10,000.00; and

(e)    reimbursement of Lender's out of pocket expenses, including Legal Fees and any fees and costs payable by Lender as set forth in the MCA or any amendment, modification or supplement thereto, incurred in connection with the underwriting of the Loans or the Closing.

3.02    **Borrowing Base Certificate.** The initial Operating Line of Credit 3 Loan is subject to the additional conditions precedent that Lender has received a Borrowing Base Certificate.

3.03    **Additional Loans.** Lender's obligation to make each additional Loan under this Operating Line of Credit 3 is subject to the conditions precedent that on the Drawdown Date:

(a)    Lender shall receive a Loan Request;

(b)    the following statements are correct (and Borrower will be deemed to represent to Lender that those representations are correct) as of the Drawdown Date: (i) the representations and warranties in the Loan Documents are correct as though made on that date, (ii) no Event of Default or event which, with the passage of time or the giving of notice would constitute an Event of Default, has occurred and remains uncured or would result from the additional Loan; (iii) there has been no change in the financial condition of Borrower since the effective date of this Facility Sheet, that would have a Material Adverse Effect on Borrower; and (iv) the unpaid principal amount of all

McClain MCA 2018
Operating Line of Credit 3 Facility Sheet    2

outstanding Loans under the Operating Line of Credit 3 facility under which those Loans are made, together with the amount of that additional Loan does not exceed the Operating Line of Credit 3 facility under this Facility Sheet.

**ARTICLE 4 – REPRESENTATIONS AND WARRANTIES**

Until such time as all Obligations have been paid in full and Lender has no obligation to make any additional advance under the Loan, Borrower or the Person or Persons being one or more of the Borrowers as may be specifically named in any of the following representations and covenants) agrees to and makes the following representations and covenants:

4.01    **Master Credit Agreement Representation.** Borrower re-makes and confirms all Borrower Representations set forth in the MCA.

4.02    **Entire Agreement.** This Facility Sheet and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Borrower concerning this credit, (ii) replace any prior oral or written agreements between Lender and Borrower concerning this credit; and (iii) are intended by Lender and Borrower as the final, complete and exclusive statement of the terms agreed to by them.

4.03    **Covenants.** Borrower hereby makes and agrees to be bound by all of the Covenants as set forth on Schedule 1 attached hereto and made a part hereof.

4.04    **Reporting Requirements.** Borrower hereby makes and agrees to be bound by all of the Reporting Requirements as set forth on Schedule 2 attached hereto and made a part hereof.

4.05    **WAIVER OF PRIOR CLAIMS.** BORROWER WAIVES AND RELEASES ANY AND ALL CLAIMS AGAINST LENDER, ITS PARENT, SUBSIDIARIES, AFFILIATES AND ITS MERGED PREDECESSOR, AS SERVICES OF AMERICA, INC., THE SUBSIDIARY OF SUCH PREDECESSOR, AS AGENT, AS AGENT, SERVICES, AGENT, PARTICIPANTS, AGENTS AND EMPLOYEES OF EACH AND ALL OF THE FOREGOING, RELATING OR PERTAINING TO OR AS A RESULT OF THE EXISTING LOANS, AND ANY OTHER ACT OR OMISSION WHICH HAS OCCURRED PRIOR TO THE EXECUTION OF THIS FACILITY SHEET, INCLUDING ALL CLAIMS OF USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, OR LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR EQUITY, OR ANY ACT OR VIOLATION OF ANY LAW, RULE OR REGULATION.

4.06    **Expenses.** The Borrower shall pay within ten (10) Business Days after demand by Lender, all costs and expenses incurred (or reimburse Lender for payment of) in connection with the preparation, execution, delivery, filing, and administration of this Facility Sheet (including, without limitation, Legal Fees incurred in connection of the preparation of this Facility Sheet and advising the Lender as to its rights, and the cost of any credit verification reports or field examinations of the Borrower's properties or books and records).

4.07    **State Specific Addendum.** The following state specific language is hereby added to this Facility Sheet as set forth on Schedule 3 attached hereto and made a part hereof.

4.08    **Counterpart Execution.** This Facility Sheet may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. The counterparts of the Facility Sheet may be executed by electronic signature and delivered by email or facsimile, so long as such method of execution and delivery is acceptable to Lender in Lender's sole discretion.

BORROWER AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT:

Address for Notices:
824 Mullins Lane
Benton, KY 42025

MCCLAIN FEED YARD, INC., a Texas corporation

By: _____
BRIAN KEITH MCCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42025

MCCLAIN FARMS, INC., a Kentucky corporation

By: _____
BRIAN KEITH MCCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42025

TM CATTLE FEEDERS, INC., a Kentucky corporation

By: _____
BRIAN KEITH MCCLAIN
President

The undersigned is a Guarantor pursuant to the terms of an existing Master Loan Guaranty from the undersigned to Lender with respect to this Facility Sheet and hereby acknowledges the terms and conditions hereof.

Address for Notices:
824 Mullins Lane
Benton, KY 42025

GUARANTOR UNDER THE MASTER GUARANTY:

_____
BRIAN KEITH MCCLAIN

McClain MCA 2018
Operating Line of Credit 3 Facility Sheet    3

LENDER:

Address for Notices:
14767 N. Outer 40 Road, Suite 400
Chesterfield, MO 63017
Attention: Loan Closing Department

RABO AGRIFINANCE LLC

By: _____
Name: W B Lawson III
Title: VP

McClain MCA 2018
Operating Line of Credit 3 Facility Sheet    4

## SCHEDULE 1

### Covenants

Until such time as all Obligations have been paid in full and Lender has no obligation to make additional Loans:

**1.01  Insurance.**

(a)  If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the lesser of 1) the full unpaid principal balance of the Loan, 2) the total replacement value of any structure located in the flood hazard area or 3) the maximum amount available under the National Flood Insurance Program for the particular type of property, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the Loan.

## SCHEDULE 2

### Reporting Requirements

**2.01  Reporting Requirements.**  Borrower shall furnish to Lender:

(a)  no later than 20 days after the end of each month, a Borrowing Base Certificate current as of the end of that month;

(b)  promptly upon receipt, copies of all Notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Substances with regard to Borrower's property, activities, or operations, or (ii) any claim against Borrower regarding Hazardous Substances;

(c)  promptly upon Lender's request, all other books, records, statements, lists of property and accounts, budgets, forecasts, reports, records or other information pertaining to the condition or operations of Borrower or Guarantor requested by Lender.

## SCHEDULE 3

### STATE SPECIFIC ADDENDUM

**1.01  Insurance.**

(a)  TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE: (A) GRANTOR OR BORROWER IS REQUIRED TO (i) KEEP THE MORTGAGED PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT SPECIFIED HEREIN; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER OR OTHERWISE AS PROVIDED HEREIN; AND (iii) NAME THE BENEFICIARY AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS AS PROVIDED HEREIN; (B) SUBJECT TO THE PROVISIONS HEREOF, GRANTOR OR BORROWER MUST, IF REQUIRED BY BENEFICIARY, DELIVER TO BENEFICIARY A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) SUBJECT TO THE PROVISIONS HEREOF, IF GRANTOR OR BORROWER FAILS TO MEET ANY REQUIREMENT LISTED IN THE FOREGOING SUBPARTS (A) OR (B), BENEFICIARY MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF GRANTOR OR BORROWER AT GRANTOR'S OR BORROWER'S EXPENSE.

**1.02  Indemnification.**  BORROWER SHALL DEFEND, INDEMNIFY AND HOLD LENDER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS: (I) INCURRED AS A RESULT OF THE FAILURE BY BORROWER TO BORROW THE AMOUNT SPECIFIED IN A LOAN REQUEST (INCLUDING ANY FAILURE RESULTING FROM THE FAILURE TO FULFILL THE APPLICABLE CONDITIONS PRECEDENT), INCLUDING ANY LOSS OR ANTICIPATED PROFITS AND LOSSES BY REASON OF THE LIQUIDATION OR REEMPLOYMENT OF FUNDS ACQUIRED BY LENDER TO FUND THE LOAN; (II) AS A RESULT OF ITS ACTS OR OMISSIONS WHICH RESULT FROM COMMUNICATIONS GIVEN OR PURPORTED TO BE GIVEN, BY BORROWER OR ANY DESIGNATED PERSON, WHICH ARE INTERRUPTED, WHICH ARE MISUNDERSTOOD, OR WHICH ARE IN FACT FROM UNAUTHORIZED PERSONS; (III) ARISING OUT OF OR RESULTING FROM THE VIOLATION BY BORROWER OF ANY ENVIRONMENTAL LAW; (IV) RESULTING FROM THE RELIANCE BY LENDER ON EACH NOTICE PURPORTEDLY GIVEN BY OR ON BEHALF OF BORROWER; (V) INCURRED BY LENDER UNDER ANY GUARANTY, INDEMNITY OR THE LIKE GIVEN IN BANKING COUNTERPARTY, WITH RESPECT TO INDEMNIFIED BANKING COUNTERPARTY LIABILITIES; AND (VI) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS AS A RESULT OF LENDER BEING PARTY TO THIS AGREEMENT OR THE TRANSACTIONS CONSUMMATED PURSUANT TO THIS AGREEMENT; THIS INDEMNIFICATION SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO MATTERS WHICH, IN WHOLE OR IN PART, ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE (WHETHER SOLE, COMPARATIVE, OR CONTRIBUTORY) OR STRICT LIABILITY OF SUCH INDEMNIFIED PERSON. HOWEVER, SUCH INDEMNITY SHALL NOT APPLY TO ANY INDEMNIFIED PERSON TO THE EXTENT THAT ANY SUCH LOSS IS ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THAT INDEMNIFIED PERSON AS DETERMINED BY A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THAT ANY INDEMNITY INDEMNIFIED PERSON, BORROWER SHALL MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION THEREOF WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. ALL INDEMNITIES UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES SHALL SURVIVE THIS TERMINATION OF THIS AGREEMENT.

**1.03  Notice of Final Agreement.**  THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**1.04  Waiver of Appraisal Right.**  Guarantor hereby agrees that:

(a)  In the event an interest in any of Borrower's real property (the "Property") is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code or any successor statute (as the same may be amended from time to time), and to the extent permitted by law, Lender shall be entitled to seek a deficiency judgment from Borrower, Guarantor and any other party obligated on the Note equal to the difference between the amount of the Loans secured by the Property and the amount for which the Property was sold pursuant to judicial or nonjudicial foreclosure sale. Guarantor expressly recognizes that this paragraph constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Borrower, Guarantor and other persons against whom recovery of deficiencies is sought (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property at the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Guarantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Borrower, Guarantor and others against whom recovery of a deficiency is sought.

(b)  Alternatively, in the event the waiver provided for in subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, to the fullest extent not prohibited by applicable laws, the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time):

(i)  the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure;

(ii)  the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than six months) following the foreclosure sale;

(iii)  all reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Property, including, without limitation, brokerage commissions, title insurance, a survey of the Property, tax prorations, seller's attorneys' fees and marketing costs;

(iv)  the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in subsection (iii) above) and other maintenance expenses; and

any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five years' experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

**1.05  Business Loan.**  Borrower acknowledges that the proceeds of the Loan are primarily for agricultural, commercial, investment or business purposes, and are not for a consumer transaction.

22122452

**FACILITY SHEET**

(OPERATING LINE OF CREDIT 3)

This Facility Sheet (as may be amended, modified or supplemented from time to time, referred to herein as this "Facility Sheet") is dated as of July 14, 2022 and is with regard to Facility Loan No. 22122452 between MCCLAIN FEED YARD, INC., a Texas corporation ("McClain Feed Yard"), MCCLAIN FARMS, INC., a Kentucky corporation ("McClain Farms"), and 7M CATTLE FEEDERS, INC., a Kentucky corporation ("7M Cattle Feeders") (McClain Feed Yard, McClain Farms, and 7M Cattle Feeders are here individually and collectively, "Borrower"), RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") and hereby supersedes any and all previous facility sheets that governed this obligation.

Parties and Lender have entered into a Master Credit Agreement ("MCA") dated May 11, 2018 which may include schedules, addendums, and exhibits thereto. The MCA incorporates by reference and includes a Schedule of Definitions and Covenants ("Schedule of Definitions and Covenants") dated of even date with the MCA and any Applicable Obligor Covenant Schedule. Borrower and Guarantor agree that Borrower and Guarantor have received and reviewed the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. All terms, covenants, conditions and restrictions set forth in the MCA are incorporated herein by reference as if fully set forth herein. Capitalized terms contained in this Facility Sheet are used as defined in the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. Some or all of the capitalized terms defined in the Schedule of Definitions and Covenants are used in this Facility Sheet as so defined and the terms of such Schedule of Definitions and Covenants are incorporated by reference into this Facility Sheet for purposes of so defining the capitalized terms that are used in this Facility Sheet in accordance with the Schedule of Definitions and Covenants. To the extent any term is defined in the Schedule of Definitions and Covenants but is not used in this Facility Sheet or any amendment, modification or supplement to this Facility Sheet, such term shall be deemed to be disregarded, of no meaning and without any effect. Except as otherwise defined in this Facility Sheet, the MCA or in the Schedule of Definitions and Covenants, or unless the context otherwise requires, each term that is used in this Facility Sheet which is defined in Article II of the UCC shall have the meaning ascribed to that term in Article II of the UCC.

Borrower requests that Lender make a Loan pursuant to this Facility Sheet. Lender agrees to make such Loan, subject to the terms and conditions of this Facility Sheet, the MCA and the Schedule of Definitions and Covenants.

**ARTICLE I - PRINCIPAL LOAN TERMS**

This Facility Sheet is made and entered on the following Loan terms:

1.01   **Loan Type**. The Loan Type being made pursuant to this Facility Sheet is as follows: Operating Line of Credit 3.

1.02   **The Operating Line of Credit 3**. Lender shall extend credit from time to time during the Operating Line of Credit 3 Advance Period, subject to the terms and conditions of this Facility Sheet (that period, including extensions, if any, the "Operating Line of Credit 3 Advance Period") by making Loans to Borrower (each such loan) on a revolving basis.

1.03   **Maximum Amount**. The aggregate unpaid principal balance of the Operating Line of Credit 3 must not exceed the lesser of: (i) $48,000,000.00 or (ii) the Operating Line of Credit 3 Borrowing Base ("Operating Line of Credit 3 Maximum Amount").

1.04   **Borrowing Base**.

(a)   "Operating Line of Credit 3 Borrowing Base" means the sum of:

(i)      80% of Eligible Accounts Receivable; plus
(ii)     75% of Eligible Cattle Value of Eligible Cattle; plus
(iii)    60% of the Value of Eligible Cattle Down Payments; plus
(iv)    100% of Eligible Commodity Hedge Accounts; plus
(v)     100% of the Eligible Demand Deposit Accounts; plus
(vi)    75% of the Value of Eligible Feed and Grain Inventory; plus
(vii)   85% of the Eligible Cattle Value of Eligible Hedged Cattle; plus
(viii)  100% of Eligible Investment in Growing Crops; plus
(ix)    100% of Eligible Packer Accounts Receivables; plus
(x)     75% of the Eligible Cattle Value of Eligible Pasture Cattle; plus
(xi)    80% of the Eligible Cattle Value of Eligible Prominent Feedlot Cattle; plus
(xii)   100% of Eligible Prepaid Feed and Input Expenses; plus
(xiii)  100% of the Eligible Cattle Value of Eligible Prominent Feedlot Cattle; minus
(xiv)   100% Relatied Payables and Liabilities; minus
(xv)    100% Book Overdraft/Outstanding Pending Transactions
(xvi)   100% of Cattle Deposits Received

(b)   The Operating Line of Credit 3 Borrowing Base for purposes of the initial Loan will be determined by the most recent Operating Line of Credit 3 Borrowing Base Certificate received by Lender, subject however, to adjustments by Lender associated with this agreement. The Operating Line of Credit 3 Borrowing Base for purposes of subsequent Loans will be determined by Borrower, subject however, to adjustments by Lender associated with this agreement. Each Loan Request for the Loan deemed to be a representation by Borrower to Lender that the unpaid principal balance of the Line of

McClain MCA 2018
Operating Line of Credit 3 Facility Sheet

1

---

credit after the requested Loan will not exceed the maximum amount of the Line of credit under this agreement. Notwithstanding the provisions of this section to the contrary, Lender may as a precondition to any Loan require Borrower to deliver to Lender a current Borrowing Base Certificate.

1.05   **Loans under the Operating Line of Credit 3**. Loans under the Operating Line of Credit 3 are subject to Article 3 below. The Operating Line of Credit 3 Loan must be used only for funding the operations of McClain Feed Yard, Inc., 7M Cattle Feeders, Inc., and McClain Farms, Inc.

1.06   **Revolving Nature**. The Operating Line of Credit 3 is a Revolving Line of Credit and during the Operating Line of Credit 3 Advance Period, subject to the terms and conditions of this Facility Sheet, Borrower may repay principal amounts and reborrow them.

1.07   **Interest Rate**. The unpaid principal balance of Loans under the Operating Line of Credit 3 will bear an Interest Rate equal to the one month Term SOFR plus "Index Rate" plus 2.750% per annum. Adjusted on the first day of each month, provided that in no event shall the Interest Rate be less than the Floor Rate of zero, notwithstanding any contrary Floor Rate provision for Daily Simple SOFR or Term SOFR in the MCA or any amendment, modification or supplement thereto.

1.08   **Required Payments; Maturity Date**.

(a)   Borrower shall pay accrued interest on the Operating Line of Credit 3 on November 1, 2023 and on the first day of each February, May, August and November after the Closing Date to the Operating Line of Credit 3 Maturity Date.

(b)   The unpaid principal balance of, all unpaid accrued interest on, and other charges under this Facility Sheet with respect to the Operating Line of Credit 3, shall be paid on August 1, 2023 (the "Operating Line of Credit 3 Maturity Date").

1.09   **Prepayments**. Prepayments of the Operating Line of Credit 3 may be made at any time without Prepayment Fee or penalty.

1.10   **The Operating Line of Credit 3 Note**. Loans under the Operating Line of Credit 3 have been or will be evidenced by this Facility Sheet and a promissory note in a form provided by Lender (the "Operating Line of Credit 3 Note").

**ARTICLE II - COVENANTS REGARDING THE LOAN TYPE MADE UNDER THIS FACILITY SHEET**

2.01   **Loan Proceeds**. Each Loan will be made upon the request of Borrower. Each Loan Request (a) must comply with the notice requirements of Article II of the MCA; (b) at Lender's option, shall be received by Lender before 12:00 noon (St. Louis, Missouri time) (i) if the Loan is to be a SOFR Rate Loan, on a Business Day which is not less than two Business Days prior to the date of the Loan and (ii) in the case of other Loans, on a Business Day which is not less than one business day prior to the date of the Loan; and (c) must specify the amount of the Loan. No Loan will be made if the Interest Rate for that Loan would exceed the Maximum Rate or, subject to the terms of this section, if the amount would exceed the Operating Line of Credit 3 Maximum Amount under the terms of this Facility Sheet. Each Loan Request will be irrevocable. Notwithstanding the Operating Line of Credit 3 Maximum Amount under the terms of this Facility Sheet, Lender may approve Loan Requests for Loans which exceed the Operating Line of Credit 3 Maximum Amount (provided if Lender exercises its discretion in so funding, Lender may, in its sole discretion, bear interest at the rate otherwise under the terms of this Facility Sheet. Each Permitted Over-Advance will, unless otherwise agreed by Lender, be payable on demand. The making payment of principal applicable to a Loan made pursuant to each Loan Request, and be subject to the provisions of Section 3.03 of the MCA regarding payment of principal and interest upon demand and all other terms and provisions of this Facility Sheet, whenever applicable to such Loan.

2.02   **Prepayments Generally**. Borrower may, at the option of making any Prepayment subject to payment of all amounts due on this Lender under this Facility Sheet. Each Prepayment of a portion of the Loan will be applied to the most remote payment of the principal due under this Facility Sheet. If Lender receives any Prepayment which is permitted to be made hereunder, Lender may accept the Prepayment, except that Lender may, as a Facility Sheet provided for payment of interest which would accrue on the amount Prepaid through the date when Lender would be obligated to accept the Prepayment, on the date the principal amount Prepaid would be due under this Facility Sheet, whichever is earlier.

2.03   **Default Rate**. Upon the occurrence of an Event of Default, the principal balance of the Loan and, to the extent permitted by Applicable Law, all other Loan Obligations shall, from the date of the Event of Default and the date Lender notifies Borrower that it is waived or cured or Applicable Law the provisions of the Schedule of Definitions and Covenants of all Loan Obligations are paid in full, bear interest at the Operating Line of Credit 3 Default Rate. Subject to the provisions of the Schedule of Definitions and Covenants and this Facility Sheet, the "Operating Line of Credit 3 Default Rate" means the rate applicable to the unpaid principal balance of the Operating Line of Credit 3 plus 4.000% per annum. Interest payable at the Operating Line of Credit 3 Default Rate shall be paid from time to time on demand, or if not sooner demanded, on the first day of each month. The provisions of this section may result in compounding of interest. The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

**ARTICLE III - CONDITIONS**

3.01   **Conditions of the Loan**. Lender's obligation to make the Loan(s) is subject to the following conditions precedent:

(a)   Guarantor has executed and delivered to Lender a guaranty of the payment and performance of the Loan Obligations; and

(b)   Lender has received a Borrowing Base Certificate;

(c)   Lender has received a written opinion from Borrower's and Guarantor's legal counsel acceptable to Lender, covering all issues required by Lender; and

(d)   reimbursement of Lender's out of pocket expenses, including Legal Fees and other costs and expenses payable by Lender as set forth in the MCA or any amendment, modification or supplement thereto, incurred in connection with the underwriting of the Loans or the Closing.

3.02   **Borrowing Base Certificate**. The initial Operating Line of Credit 3 Loan is subject to the additional condition precedent that Lender has received a Borrowing Base Certificate.

3.03   **Additional Loans**. Lender's obligation to make each additional Loan under this Operating Line of Credit 3 is subject to the conditions precedent that on the Drawdown Date:

(a)   Lender shall receive a Loan Request;

(b)   the following statements are correct (and Borrower will be deemed to represent to Lender that these representations are correct) as of the Drawdown Date: (i) the representations and warranties in the Loan Documents are correct as though made on that date; (ii)

McClain MCA 2018
Operating Line of Credit 3 Facility Sheet

2

---

no Event of Default or event which, with the passage of time or the giving of notice would constitute an Event of Default, has occurred and remains unwaived or would result from the additional Loan; (iii) there has been no change in the financial condition of Borrower since the effective date of this Facility Sheet, that would have a Material Adverse Effect on Borrower; and (iv) the unpaid principal amount of all outstanding Loans under the Operating Line of Credit 3 Loans including each additional Loan would not exceed the amount of that additional Loan does not exceed the Operating Line of Credit 3 Maximum Amount thereof under the terms of this Facility Sheet.

Until such time as all Obligations have been paid in full and Lender has no obligation to make any additional advance under the Loan, Borrower (or the Person or Persons being one or more of the Borrowers as may be specifically named in any of the following representations and covenants) agrees to and makes the following representations and covenants.

**ARTICLE IV – REPRESENTATIONS AND WARRANTIES**

4.01   **Master Credit Agreement Representations**. Borrower re-makes and confirms all Borrower Representations set forth in the MCA.

4.02   **Entire Agreement**. This Facility Sheet and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Borrower concerning this credit; (ii) replace any prior oral or written agreements between Lender and Borrower concerning this credit; and (iii) are intended by Lender and Borrower as the final, complete and exclusive statement of the terms agreed to by them.

4.03   **Covenants**. Borrower hereby makes and agrees to be bound by all of the Reporting Requirements as set forth in Schedule 2 attached hereto and made a part hereof.

4.04   **Reporting Requirements**. Borrower hereby makes and agrees to be bound by all of the Reporting Requirements as set forth in Schedule 2 attached hereto and made a part hereof.

4.05   **Waiver of Prior Claims**. BORROWER WAIVES AND RELEASES ANY AND ALL CLAIMS AGAINST LENDER, ITS PARENT, SUBSIDIARIES, AFFILIATES AND RELATED PREDECESSORS AND SERVICES OF AMERICA, INC., THE SUBSIDIARY OF EACH PREDECESSORS, ALL ACCEPTANCE CORPORATION, AND THE RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, PARTICIPANTS, AGENTS AND OTHER ACT OR OMISSION. ALL OF THE FOREGOING, RELATING OR PERTAINING TO OR AS A RESULT OF THE EXISTING LOANS, AND ANY OTHER ACT, FRAUD, DECEIT, WHICH HAS OCCURRED PRIOR TO THE EXECUTION OF THIS FACILITY SHEET, AND/OR ALL CLAIMS OF USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, OR LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR IN CONTRACT, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

4.06   **Expenses**. The Borrower shall pay within ten (10) Business Days after demand from Lender, all costs and expenses incurred (i) reimburse Lender for payment in connection with the preparation, execution, delivery, filing, and administration of this Facility Sheet (including, without limitation, Legal Fees incurred in connection with the preparation of this Facility Sheet and enforcement of the terms and its rights, and the cost of any credit verification reports or field examinations of the Borrower's properties or books and records).

4.07   **State-Specific Addendum**. The following state specific language is hereby added to this Facility Sheet as set forth on Schedule 3 attached hereto and made a part hereof.

4.08   **Counterpart Execution**. This Facility Sheet may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. The counterparts of the Facility Sheet may be executed by electronic signature and delivered by email or facsimile, so long as such method of execution and delivery is acceptable to Lender in Lender's sole discretion.

BORROWER AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT:

Address for Notices:                    MCCLAIN FEED YARD, INC., a Texas corporation
824 Mullins Lane
Benton, KY 42025                        By: _____
                                        BRIAN KEITH MCCLAIN
                                        President

Address for Notices:                    MCCLAIN FARMS, INC., a Kentucky corporation
824 Mullins Lane
Benton, KY 42025                        By: _____
                                        BRIAN KEITH MCCLAIN
                                        President

Address for Notices:                    7M CATTLE FEEDERS, INC., a Kentucky corporation
824 Mullins Lane
Benton, KY 42025                        By: _____
                                        BRIAN KEITH MCCLAIN
                                        President

The undersigned is a Guarantor pursuant to the terms of an existing Master Guaranty from the undersigned to Lender with respect to this Facility Sheet and hereby acknowledges the terms and conditions hereof.

McClain MCA 2018
Operating Line of Credit 3 Facility Sheet

3

---

GUARANTOR UNDER THE MASTER GUARANTY:

Address for Notices:                    _____
824 Mullins Lane                        BRIAN KEITH MCCLAIN
Benton, KY 42025

                                        LENDER:

Address for Notices:                    RABO AGRIFINANCE LLC
14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017                  By: _____
Attention: Loan Operations              Name: W.B. Lawson III

McClain MCA 2018
Operating Line of Credit 3 Facility Sheet

4

SCHEDULE 1

Covenants

Until such time as all Obligations have been paid in full and Lender has no obligation to make additional Loans:

1.01    Insurance.

(a)    If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the lesser of 1) the full unpaid principal balance of the Loan, 2) the total replacement value of any structure located in the flood hazard area or 3) the maximum amount available under the National Flood Insurance Program for the particular type of property, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the Loan.

SCHEDULE 2

Reporting Requirements

2.01    Reporting Requirements.  Borrower shall furnish to Lender:

(a)    no later than 30 days after the end of each month, a Borrowing Base Certificate current as of the end of that month;

(b)    promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Substances with regard to Borrower's property, activities, or operations, or (ii) any claim against Borrower regarding Hazardous Substances;

(c)    promptly upon Lender's request, all other books, records, statements, lists of property and accounts, budgets, forecasts, reports, records or other information pertaining to the condition or operations of Borrower or Guarantor requested by Lender.

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

DocuSign Envelope ID: 96B0E0D9-FC32-46F8-8EED-758E4C1E467B

22123962

## FACILITY SHEET

### (OPERATING LINE OF CREDIT 3)

This Facility Sheet (as may be amended, modified or supplemented from time to time, referred to herein as this "Facility Sheet") is dated as of January 13, 2023 and is with regard to Facility Loan No. 32122962 between MCCLAIN FEED YARD, INC., a Texas corporation ("McClain Feed Yard"), MCCLAIN FARMS, INC., a Kentucky corporation ("McClain Farms"); and 7M CATTLE FEEDERS, INC., a Kentucky corporation ("7M Cattle Feeders") (McClain Feed Yard, McClain Farms, and 7M Cattle Feeders are herein individually and collectively, "Borrower"), BRIAN KEITH McCLAIN, a married person or member of a civil union or domestic partnership ("Guarantor"), and RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") and hereby supersedes any and all previous facility sheets that governed this obligation.

Parties and Lender have entered into a Master Credit Agreement ("MCA") dated May 11, 2018 which may include schedules, addendums, and exhibits thereto. The MCA incorporates by reference and includes a Schedule of Definitions and Covenants (Schedule of Definitions and Covenants") dated of even date with the MCA and any Applicable Obligor Covenant Schedule. Borrower and Guarantor agree that Borrower and Guarantor have received and reviewed the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. All terms, covenants, conditions and restrictions set forth in the MCA are incorporated herein by reference as if fully set forth herein. Capitalized terms contained in this Facility Sheet are used as defined in the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. Some or all of the capitalized terms defined in the Schedule of Definitions and Covenants are used in this Facility Sheet as so defined and the terms of such Schedule of Definitions and Covenants are incorporated by reference into this Facility Sheet for purposes of the individual defined terms that are used in this Facility Sheet in accordance with the Schedule of Definitions and Covenants. To the extent any capitalized defined terms used in this Facility Sheet are defined differently or not used in this Facility Sheet or any amendment, modification or supplement to this Facility Sheet, such term shall be deemed to be disregarded, of no meaning and without any effect. Except as otherwise defined in this Facility Sheet, the MCA or in the Schedule of Definitions and Covenants or unless the context otherwise requires, each term that is used in this Facility Sheet which is defined in Article II of the UCC shall have the meaning accorded to that term in Article II of the UCC.

Borrower requests that Lender make a Loan pursuant to this Facility Sheet. Lender agrees to make such Loan, subject to the terms and conditions of this Facility Sheet, the MCA and the Schedule of Definitions and Covenants.

### ARTICLE 1 - PRINCIPAL LOAN TERMS

This Facility Sheet is made and entered on the following Loan terms:

**1.01** Loan Type. The Loan Type being made pursuant to this Facility Sheet is as follows: Operating Line of Credit 3

**1.02** The Operating Line of Credit 3. Lender shall extend credit from time to time during the period from the Closing Date to the Operating Line of Credit 3 Maturity Date (that period, including extensions, if any, the "Operating Line of Credit 3 Advance Period") by making Loans to Borrower (each such loan on a revolving basis.

**1.03** Maximum Amount. The aggregate unpaid principal balance of the Operating Line of Credit 3 must not exceed the lesser of: (i) $54,000,000.00 or (a) the Operating Line of Credit 3 Borrowing Base or (ii) that amount specified below:

|  | From the Closing Date through 3/31/2023: | $54,000,000.00 |
|  | From 4/1/2023 through Maturity date: | $48,000,000.00 |

**(b)** Borrowing Base:

"Operating Line of Credit 3 Borrowing Base" means the sum of:

(i)  80% of Eligible Accounts Receivable; plus
(ii) 75% of the Eligible Cattle Value of Eligible Cattle; plus
(iii) 80% of the Value of Eligible Cattle Down Payments; plus
(iv) 100% of Eligible Commodity Hedge Accounts; plus
(v)  100% of Eligible Demand Deposit Accounts; plus
(vi) 100% of Eligible Feed and Grain Inventory; plus
(vii) 85% of the Eligible Cattle Value of Eligible Hedged Cattle; plus
(viii) 100% of Eligible Investment in Growing Crops; plus
(ix) 100% of Eligible Packer Accounts Receivables; plus
(x)  75% of the Eligible Cattle Value of Eligible Feeder Cattle; plus
(xi) 80% of the Eligible Cattle Value of Eligible Option Protected Cattle; plus
(xii) 80% of Eligibly Prepaid Feed and Input Expenses; plus
(xiii) 40% of the Eligible Cattle Value of Eligible Processing Inventory Cattle; minus
(xiv) 100% Related Payables and Liabilities; minus
(xv) 100% Book Overdraft/Outstanding Pending Transactions
(xvi) 100% of Cattle Deposits Received

**(b)** The Operating Line of Credit 3 Borrowing Base for purposes of the initial Loan will be determined by the most recent Borrowing Base Certificate received by Lender, subject however, to adjustments by Lender consistent with this agreement. The Operating Line of Credit 3

McClain MCA 2018
Operating Line of Credit 3 Facility Sheet

1

---

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

DocuSign Envelope ID: 96B0E0D9-FC32-46F8-8EED-758E4C1E467B

Borrowing Base for purposes of subsequent Loans will be determined by Borrower, subject however, to adjustments by Lender consistent with this agreement. Each Loan Request for the Loan will be deemed a representation by Borrower to Lender that the unpaid principal balance of the Line of credit after the requested Loan will not exceed the maximum amount of the Line of credit under this agreement. Notwithstanding the provisions of this section to the contrary, Lender may as a precondition to any Loan require Borrower to deliver to Lender a current Borrowing Base Certificate.

**1.05** Loans under the Operating Line of Credit 3. Loans under the Operating Line of Credit 3 are subject to Article 3 below. The Operating Line of Credit 3 Loan must be used only for funding the operations of McClain Feed Yard, Inc., 7M Cattle Feeders, Inc., and McClain Farms, Inc.

**1.06** Revolving Nature. The Operating Line of Credit 3 is a Revolving Line of Credit, and during the Operating Line of Credit 3 Advance Period, subject to the terms and conditions of this Facility Sheet, Borrower may repay principal amounts and reborrow them.

**1.07** Interest Rate. The unpaid principal balance of Loans under the Operating Line of Credit 3 will bear an Interest Rate equal to the one month Term SOFR (the "Index Rate") plus 3.000% per annum. Adjusted on the first day of each month, provided that in no event shall the Interest Rate be less than the Floor Rate (notwithstanding any contrary Floor Rate provisions or any for Daily Simple SOFR or Term SOFR in the MCA or any amendment, modification or supplement thereto.

**1.08** Required Payments; Maturity Date.

(a)  Borrower shall pay accrued interest on the Operating Line of Credit 3 on November 1, 2021 and on the first day of each February, May, August and November after the Closing Date to the Operating Line of Credit 3 Maturity Date.

(b)  The unpaid principal balance of, all unpaid accrued interest on, and other charges under this Facility Sheet with respect to the Operating Line of Credit 3, shall be paid on August 1, 2023 (the "Operating Line of Credit 3 Maturity Date").

**1.09** Prepayments. Prepayments of the Operating Line of Credit 3 may be made at any time without Prepayment Fee or penalty.

**1.10** The Operating Line of Credit 3 Note. Loans under the Operating Line of Credit 3 have been or will be evidenced by this Facility Sheet and a promissory note in a form provided by Lender (the "Operating Line of Credit 3 Note").

### ARTICLE 2 - COVENANTS REGARDING THE LOAN TYPE MADE UNDER THIS FACILITY SHEET

**2.01** Loan Requests. Each Loan will be made upon the request of Borrower. Each Loan Request (a) must comply with the notice requirements of Article II of the MCA; (b) at Lender's option, must be received by Lender before 12:00 noon U.S. Louis Missouri time) if the Loan is to be a SOFR Rate Loan, on a Business Day which is not less than two Business Days prior to the date of the Loan and (c) must specify the amount of the Loan, on a Business Day which is not less than one Business day prior to the date of the Loan; and (c) must specify the amount of the Loan. No Loan will be made if the Interest Rate for that Loan would exceed the Maximum Rate, or, subject to the terms of this section, if the amount would exceed the Operating Line of Credit 3 Maximum Amount under the terms of this Facility Sheet. Each Loan Request will be irrevocable. Notwithstanding the provisions of this section to the contrary, Lender may approve Loan Requests for Loans which exceed the Operating Line of Credit 3 Maximum Amount under the terms of this Facility Sheet. Each Permitted Over-Advance will, unless otherwise agreed by Lender, bear interest at the rate otherwise applicable to a Loan made pursuant to such Loan Request, and be subject to the provisions of Section 3.09 of the MCA requiring payment of principal and interest upon demand and all other terms and provisions of this Facility Sheet otherwise applicable to such Loan.

**2.02** Prepayments Generally. Borrower shall have the option of making any Prepayment subject to payment of all amounts then due Lender under this Facility Sheet. Each Prepayment of a portion of the Loan will be applied to the most recents payment of the principal due under this Facility Sheet. If Lender receives any Prepayment when it is permitted to refuse, Lender may accept the Prepayment, except that Lender may, as a condition of acceptance, require the payment of interest which would accrue on the amount Prepaid through the date when Lender would be obligated to accept the Prepayment, or the date the principal amount Prepaid would be due under this Facility Sheet, whichever is earlier.

**2.03** Default Rate. Upon the occurrence of an Event of Default, the principal balance of the Loan and, to the extent permitted by Applicable Law, all other Obligations shall, from the date of the Event of Default until the date Lender notifies Borrower that it is waived or cured or all Loan Obligations are paid in full, bear interest at the Operating Line of Credit 3 Default Rate. Subject to the provisions in the Schedule of Definitions and Covenants and this Facility Sheet, the "Operating Line of Credit 3 Default Rate" means the rate applicable to the unpaid principal balance of the Operating Line of Credit 3 plus 10.000% per annum. Interest payable at the Operating Line of Credit 3 Default Rate shall be paid from time to time on demand, or if not sooner demanded, on the first day of each month. The provisions of this section may result in compounding of interest. The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

### ARTICLE 3 - CONDITIONS

**3.01** Conditions of the Loan. Lender's obligation to make the Loan(s) is subject to the following conditions precedent:

(a)  Guarantor has executed and delivered to Lender a guaranty of the payment and performance of the Loan Obligations (the "Guaranty");

(b)  Lender has received a Borrowing Base Certificate;

(c)  Lender has received a written opinion from Borrower's and Guarantor's legal counsel acceptable to Lender, covering all issues required by Lender; and

(d)  reimbursement of Lender's out of pocket expenses, including Legal Fees and any fees and costs payable by Lender as set forth in the MCA or any amendment, modification or supplement thereto, incurred in connection with the underwriting of the Loans or the Closing.

**3.02** Borrowing Base Certificate. The initial Operating Line of Credit 3 Loan is subject to the additional conditions precedent that Lender has received a Borrowing Base Certificate.

**3.03** Additional Loans. Borrower's obligation to make each additional Loan under this Operating Line of Credit 3 is subject to the conditions precedent that on the Drawdown Date:

(a)  Lender shall receive a Loan Request;

McClain MCA 2018
Operating Line of Credit 3 Facility Sheet

2

---

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

DocuSign Envelope ID: 96B0E0D9-FC32-46F8-8EED-758E4C1E467B

(b)  the following statements are correct and Borrower will be deemed to represent to Lender that those representations are correct as of the Drawdown Date: (i) the representations and warranties in the Loan Documents are correct as though made on that date; (ii) no Event of Default or event which, with the passage of time or the giving of notice would constitute an Event of Default, has occurred and remains uncured or would result from the additional Loan; (iii) there has been no change in the financial condition of Borrower since the effective date of this Facility Sheet, that would have a Material Adverse Effect on Borrower; and (iv) the unpaid principal amount of all outstanding Loans under the Operating Line of Credit 3 facility under which these Loans are made, together with the amount of that additional Loan does not exceed the Operating Line of Credit 3 Maximum Amount under the terms of this Facility Sheet.

### ARTICLE 4 - REPRESENTATIONS AND WARRANTIES

Until such time as all Obligations have been paid in full and Lender has no obligation to make any additional advance under the Loan, Borrower (or the Person or Persons being one or more of the Borrowers as may be specifically named in any of the following representations and covenants) agrees to and makes the following representations and covenants:

**4.01** Master Credit Agreement Representations. Borrower re-makes and confirms all of Borrower Representations set forth in the MCA.

**4.02** Entire Agreement. This Facility Sheet and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Borrower concerning this credit; (ii) replace any prior oral or written agreements between Lender and Borrower concerning this credit; and (iii) are intended by Lender and Borrower as the final, complete and exclusive statement of the terms agreed to by them.

**4.03** Covenants. Borrower hereby makes and agrees to be bound by all of the Covenants as set forth on Schedule 1 attached hereto and made a part hereof.

**4.04** Reporting Requirements. Borrower hereby makes and agrees to be bound by all of the Reporting Requirements as set forth on Schedule 2 attached hereto and made a part hereof.

**4.05** WAIVER OF PRIOR CLAIMS. BORROWER WAIVES AND RELEASES ANY AND ALL CLAIMS AGAINST LENDER, ITS PARENT, SUBSIDIARIES, AFFILIATES AND ITS MERGED PREDECESSOR, AS SERVICES OF AMERICA, INC., THE SUBSIDIARY OF SUCH PREDECESSOR, AG ACCEPTANCE CORPORATION, AND THE RESPECTIVE SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS AND EMPLOYEES OF EACH AND ALL OF THE FOREGOING, RELATING OR PERTAINING TO OR AS A RESULT OF THE EXISTING LOANS, INCLUDING ANY OTHER ACT OR OMISSION WHICH HAS OCCURRED PRIOR TO THE EXECUTION OF THIS FACILITY SHEET, INCLUDING ALL CLAIMS OF USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, OR LENDER LIABILITY, ANY OTHER CLAIM FORT OR BY CONTRACT OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

**4.06** Expenses. The Borrower shall pay within ten (10) Business Days after demand by Lender, all costs and expenses incurred (or reimburse Lender for payment of) in connection with the preparation, execution, delivery, filing, and administration of this Facility Sheet (including, without limitation, Legal Fees incurred in connection with the preparation of this Facility Sheet) and advising the Lender as to its rights, and the cost of any credit verification reports or field examinations of the Borrower's properties or books and records.

**4.07** State Specific Addendum. The following state specific language is hereby added to this Facility Sheet as set forth on Schedule 3 attached hereto and made a part hereof.

**4.08** Counterpart Execution. This Facility Sheet may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. The counterparts of this Facility Sheet may be executed by electronic signature and delivered by email or facsimile, so long as such method of execution and delivery is acceptable to Lender in Lender's sole discretion.

BORROWER AND GRANTOR UNDER THE MASTER SECURITY AGREEMENT

Address for Notices:                MCCLAIN FEED YARD, INC., a Texas corporation

824 Mullins Lane
Benton, KY 42025                    By: _____
                                    BRIAN KEITH McCLAIN
                                    President

Address for Notices:                MCCLAIN FARMS, INC., a Kentucky corporation

824 Mullins Lane
Benton, KY 42025                    By: _____
                                    BRIAN KEITH McCLAIN
                                    President

Address for Notices:                7M CATTLE FEEDERS, INC., a Kentucky corporation

824 Mullins Lane
Benton, KY 42005                    By: _____
                                    BRIAN KEITH McCLAIN
                                    President

The undersigned is a Guarantor pursuant to the terms of an existing Master Guaranty from the undersigned to Lender with respect to this Facility Sheet and hereby acknowledges the terms and conditions thereof.

McClain MCA 2018
Operating Line of Credit 3 Facility Sheet

3

---

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

DocuSign Envelope ID: 96B0E0D9-FC32-46F8-8EED-758E4C1E467B

GUARANTOR UNDER THE MASTER GUARANTY:

Address for Notices:               _____
                                   BRIAN KEITH McCLAIN
824 Mullins Lane
Benton, KY 42025

LENDER:

Address for Notices:               RABO AGRIFINANCE LLC

14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017             By: _____
Attention: Loan Operations         Name: W.B. Lawson III
                                   Title: VP

McClain MCA 2018
Operating Line of Credit 3 Facility Sheet

4

DocuSign Envelope ID: 96B0E0D9-FC32-46F8-8EED-758E4C1E467B

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

SCHEDULE 1

Documents

Until such time as all Obligations have been paid in full and Lender has no obligation to make additional Loans:

1.01    Insurance.

(a)    If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the lesser of 1) the full unpaid principal balance of the Loan, 2) the total replacement value of any structure located in the flood hazard area or 3) the maximum amount available under the National Flood Insurance Program for the particular type of property, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the Loan.

---

DocuSign Envelope ID: 96B0E0D9-FC32-46F8-8EED-758E4C1E467B

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

SCHEDULE 2

Reporting Requirements

2.01    Reporting Requirements. Borrower shall furnish to Lender:

(a)    no later than 30 days after the end of each month, a Borrowing Base Certificate current as of the end of that month;

(b)    promptly upon receipt, copies of all Notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Substances with regard to Borrower's property, activities, or operations, or (ii) any claim against Borrower regarding Hazardous Substances;

(c)    promptly upon Lender's request, all other books, records, statements, lists of property and accounts, budgets, forecasts, reports, records or other information pertaining to the condition or operations of Borrower or Guarantor requested by Lender.

---

DocuSign Envelope ID: 96B0E0D9-FC32-46F8-8EED-758E4C1E467B

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

SCHEDULE 3

STATE SPECIFIC ADDENDUM

1.01    Insurance.

(a)    *TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE: (A) GRANTOR OR BORROWER IS REQUIRED TO (i) KEEP THE MORTGAGED PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT SPECIFIED HEREIN; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER OR OTHERWISE AS PROVIDED HEREIN; AND (iii) NAME THE BENEFICIARY AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS AS PROVIDED HEREIN; (B) SUBJECT TO THE PROVISIONS HEREOF, GRANTOR OR BORROWER MUST, IF REQUIRED BY BENEFICIARY, DELIVER TO BENEFICIARY A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) SUBJECT TO THE PROVISIONS HEREOF, IF GRANTOR OR BORROWER FAILS TO MEET ANY REQUIREMENT LISTED IN THE FOREGOING SUBPARTS (A) OR (B), BENEFICIARY MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF GRANTOR OR BORROWER AT GRANTOR'S OR BORROWER'S EXPENSE.*

1.02    INDEMNIFICATION. BORROWER SHALL DEFEND, INDEMNIFY AND HOLD LENDER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS: (i) INCURRED AS A RESULT OF THE FAILURE BY BORROWER TO BORROW THE AMOUNT SPECIFIED IN A LOAN REQUEST (EXCLUDING ANY FAILURE RESULTING FROM THE FAILURE TO FULFILL THE APPLICABLE CONDITIONS PRECEDENT), INCLUDING ANY LOSS OF ANTICIPATED PROFITS AND LOSSES BY REASON OF THE LIQUIDATION OR REEMPLOYMENT OF FUNDS ACQUIRED BY LENDER TO FUND THE LOAN; (ii) AS A RESULT OF ITS ACTS OR OMISSIONS WHICH RESULT FROM COMMUNICATIONS GIVEN OR PURPORTED TO BE GIVEN, BY BORROWER OR ANY DESIGNATED PERSON, WHICH ARE INTERRUPTED, WHICH ARE MISUNDERSTOOD, OR WHICH ARE IN FACT FROM UNAUTHORIZED PERSONS; (iii) ARISING OUT OF OR RESULTING FROM THE VIOLATION BY BORROWER OF ANY ENVIRONMENTAL LAW; (iv) RESULTING FROM THE RELIANCE BY LENDER ON EACH NOTICE PURPORTEDLY GIVEN BY OR ON BEHALF OF BORROWER; (v) INCURRED BY LENDER UNDER ANY GUARANTY, INDEMNITY OR THE LIKE GIVEN TO BANKING COUNTERPARTY WITH RESPECT TO INDEMNIFIED BANKING COUNTERPARTY LIABILITIES, AND (vi) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS (AS A RESULT OF LENDER BEING PARTY TO THIS AGREEMENT OR THE TRANSACTIONS CONSUMMATED PURSUANT TO THIS AGREEMENT; THIS INDEMNIFICATION SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO MATTERS WHICH, IN WHOLE OR IN PART, ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE (WHETHER SOLE, COMPARATIVE, OR CONTRIBUTORY) OR STRICT LIABILITY OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PERSON, EXCEPT THAT BORROWER SHALL NOT BE REQUIRED TO INDEMNIFY ANY INDEMNIFIED PERSON UNDER THIS SECTION WITH RESPECT TO LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THAT INDEMNIFIED PERSON AS DETERMINED BY A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THAT ANY INDEMNITY UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES IS UNENFORCEABLE FOR ANY REASON, BORROWER SHALL MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION THEREOF PERMISSIBLE UNDER APPLICABLE LAW. ALL INDEMNITIES UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

1.03    Notice of Final Agreement. THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

1.04    Waiver of Appraisal Right. Guarantor hereby agrees that:

(a)    to the extent an event of any of Borrower's real property (the "Property") is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code or any successor statute (as the same may be amended from time to time), and to the extent permitted by law, Lender shall be entitled to seek a deficiency judgment from Borrower, Guarantor and any other party obligated on the Note equal to the difference between the amount of the Loans secured by the Property and the amount for which the Property was sold pursuant to judicial or nonjudicial foreclosure sale. Guarantor expressly recognizes that this paragraph constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Borrower, Guarantor and other persons against whom recovery of deficiencies is sought to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Guarantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Borrower, Guarantor and others against whom recovery of a deficiency is sought.

(b)    Alternatively, in the event the waiver provided for in subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, to the fullest extent not prohibited by applicable laws, the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time):

(i)    the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure;

(ii)    the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than six months) following the foreclosure sale;

(iii)    all reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Property, including, brokerage commissions, title insurance, a survey of the Property, tax prorations, seller's attorneys' fees and marketing costs;

(iv)    the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in subsection (iii) above) and other maintenance expenses; and

---

DocuSign Envelope ID: 96B0E0D9-FC32-46F8-8EED-758E4C1E467B

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five years' experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

1.05    Business Loan. Borrower acknowledges that the proceeds of the Loan are primarily for agricultural, commercial, investment or business purposes, and are not for a consumer transaction.