Obligation No. 22122952/22122953 (Operating Line of Credit 3)
Obligation No. 22114181 (Real Estate Term Loan 1)
Obligation No. 22117432 (Real Estate Term Loan 2)
Obligation No. 22122951/0000030687 (Real Estate Term Loan 3)

## AMENDED AND RESTATED FORBEARANCE AGREEMENT

This *Amended and Restated Forbearance Agreement* (the **"Agreement"**) is made and entered into as of April ___, 2023 (the **"Closing Date"**), by and among each of MCCLAIN FEED YARD, INC., a Texas corporation (**"MFY"**), MCCLAIN FARMS, INC., a Kentucky corporation (**"MF"**), 7M CATTLE FEEDERS, INC., a Kentucky corporation (**"7M"**), and BRIAN KEITH MCCLAIN, a married person or member of a civil union or domestic partnership (**"B. McClain"**), each of which is a Borrower and/or Guarantor under the Loan and Security Documents identified below, on the one hand, and RABO AGRIFINANCE LLC, a Delaware limited liability company (**"RAF"** or **"Rabo"** or **"Lender"**), as the Lender under the Loan and Security Documents identified below, on the other hand.  MFY, MF, 7M, and B. McClain shall be referred to herein collectively as the **"Loan Parties,"** and individually as a **"Loan Party."**  The Loan Parties and RAF shall be referred to herein collectively as the **"Parties."**

### Recitals

A.    RAF, B. McClain, MFY, MF and 7M are parties to that certain Forbearance Agreement that was executed by B. McClain, MFY, MF and 7M on April 9, 2023 (the **"Original Forbearance Agreement"**).  This Agreement amends and restates the Original Forbearance Agreement.  Except to the extent expressly modified by this Agreement, the terms of the Original Forbearance Agreement remain effective in all respects.

B.    RAF is the secured creditor of the Loan Parties in connection with the following extensions of credit by RAF (collectively the **"RAF Indebtedness"**):

1.    An Operating Line of Credit Loan in the original principal amount of a maximum amount of $54,000,000.00 through March 31, 2023, and $48,000,000.00 from April 1, 2023 to the Operating Line of Credit 3 Maturity Date, which is designated by RAF as Loan Obligation No. 22122952/22122953 (the **"Operating Line of Credit"**).

2.    A Real Estate Term Loan 1 in the original principal amount of $332,500.00, designated by RAF as Loan Obligation No. 22114181 (**"Real Estate Term Loan 1"**).

3.    A Real Estate Term Loan 2 in the original principal amount of $625,000.00, designated by RAF as Loan Obligation No. 221117432 (**"Real Estate Term Loan 2"**).

4.    A Real Estate Term Loan 3 in the original principal amount of $1,019,800.00, designated by RAF as Loan Obligation No. 22122951/0000030687 (**"Real

Estate Term Loan 3").

     C.    As of the April 5, 2023 (the "**Payoff Calculation Date**"), the amount of the RAF Indebtedness owed to RAF on the Operating Line of Credit, Real Estate Term Loan, Real Estate Term Loan 2 and Real Estate Term Loan 3 (collectively the "**Loans**") was the total amount of **$52,608,734.91** (the "**Outstanding Amounts Due**") (plus attorney's fees and costs and any additional amounts as noted below), consisting of the following:

Obligation No. 22122952/22122953 (Operating Line of Credit 3)

| | |
|---|---|
| Principal: | $50,628,072.06 |
| Interest: | $   717,599.12 |
| TOTAL: | $51,345,671.18 |

Obligation No. 22114181 (Real Estate Term Loan 1)

| | |
|---|---|
| Principal: | $187,759.63 |
| Interest: | $    107.77 |
| TOTAL: | $184,867.40 |

Obligation No. 22117432 (Real Estate Term Loan 2)

| | |
|---|---|
| Principal: | $179,379.62 |
| Interest: | $    96.67 |
| TOTAL: | $179,476.29 |

Obligation No. 22122951/0000030687 (Real Estate Term Loan 3)

| | |
|---|---|
| Principal: | $898,314.80 |
| Interest: | $   405.24 |
| TOTAL: | $898,720.04 |

| | |
|---|---|
| **Grand Total:** | **$52,608,734.91** |

    The Outstanding Amounts Due set forth above do not include: (1) RAF's attorney's and consultant's fees and costs incurred as of the Payoff Calculation Date, together with contractual and default interest at the Default Rate to be owed on such attorney's and consultant's fees and costs from the date that they are paid by RAF, and (2) additional interest (both contractual non-default interest and default interest at the Default Rate), as well as attorney's and consultant's fees and costs and other charges allowed by the Loan Documents, that have and will continue to accrue since the Payoff Calculation Date, and would otherwise (in the absence of the forbearance waivers outlined in this Agreement) continue to be added to the Outstanding Amounts Due. The Loan Parties agree and acknowledge that they will not dispute RAF's right to be paid interest (both contractual and Default) and attorney's and consultant's fees and other costs and expenses as outlined in the Loan Documents (which interest, attorney's fees and other costs, consultant's fees and other costs and all other expenses that had been incurred but not yet booked by RAF as of the Payoff Calculation Dates are not included in the Outstanding Amounts Due set forth

above), including such costs and expenses related to the costs of collection of the Loans (including attorney's and consultant's fees, court costs and other out-of-pocket expenses) as well as the costs and expenses incurred by RAF in connection with negotiating and documenting this Agreement, and the documentation of all documents contemplated by this Agreement.

     D.    The writings evidencing the Loans and the RAF Indebtedness and the agreements between the Parties with respect to the Loans and the collateral securing the Loans (the "**Collateral**") include (but are not limited to) the following, all of which are collectively referred to as the "**Loan Documents**":

    1.    That certain *Master Credit Agreement*, dated May 11, 2018, by and between MFY and RAF;

    2.    That certain *Joinder*, dated July 15, 2019, by and between 7M, MFY and RAF;

    3.    That certain *Joinder*, dated August 27, 2021, by and between B. McClain, MFY, 7M and RAF;

    4.    That certain *Addendum to Master Credit Agreement*, dated July 24, 2019, by and between MFY, 7M and RAF;

    5.    That certain *Addendum to Master Credit Agreement*, dated January 13, 2023, by and between MF, MFY, 7M, B. McClain and RAF;

    6.    That certain *Facility Sheet (Real Estate Term Loan 1)*, dated December 16, 2020, by and between MF, MFY, 7M, B. McClain and RAF;

    7.    That certain *Facility Sheet (Real Estate Term Loan 2)*, dated December 16, 2020, by and between MF, MFY, 7M, B. McClain and RAF;

    8.    That certain *Facility Sheet (Real Estate Term Loan 3)*, dated August 27, 2021, by and between MF, MFY, 7M, B. McClain and RAF;

    9.    That certain *Facility Sheet (Operating Line of Credit 3)*, dated January 13, 2023, by and between MF, MFY, 7M, B. McClain and RAF;

    10.    That certain *Master Loan Guaranty*, dated July 24, 2019, executed by B. McClain in favor of RAF;

    11.    That certain *Master Loan Guaranty*, dated August 27, 2021, executed by MF in favor of RAF;

    12.    That certain *Master Loan Guaranty*, dated July 24, 2019, executed by MF in favor of RAF;

3

13.    That certain *Master Loan Guaranty*, dated August 27, 2021, executed by MFY in favor of RAF;

14.    That certain *Master Loan Guaranty,* dated July 24, 2019, executed by MFY in favor of RAF;

15.    That certain *Master Loan Guaranty*, dated January 8, 2020, executed by 7M in favor of RAF;

16.    That certain *Real Estate Term Loan 1 Note*, dated May 11, 2018, in the principal amount of $332,500.00, executed by MFY in favor of RAF;

17.    That certain *Real Estate Term Loan 2 Note*, dated July 24, 2019, in the principal amount of $625,000.00, executed by 7M in favor of RAF;

18.    That certain *Real Estate Term Loan 3 Note*, dated August 27, 2021, in the principal amount of $1,019,800.00, executed by B. McClain in favor of RAF;

19.    That certain *Operating Line of Credit 3 Note*, dated January 13, 2023, in the principal amount of $54,000,000.00, executed by MFY, MFI and 7M in favor of RAF;

20.    That certain *Master Security Agreement*, dated August 27, 2021, executed by MFY, MFI and 7M, as Grantor, in favor of RAF;

21.    That certain *Master Security Agreement*, dated July 24, 2019, executed by MFY and 7M, as Grantor, in favor of RAF;

E.    The Loan Parties' Obligations under the Loans are secured by properly perfected liens on and security interests in essentially all personal property owned by MFY, MF, and 7M, including all of the following types or categories of personal property (hereinafter, the "**Personal Property Collateral**"):

1.    All accounts, contract rights, documents, documents of title, payment intangibles, investment property, chattel paper, instruments, and deposit accounts;

2.    All inventory;

3.    All equipment;

4.    All fixtures;

5.    All farm products, including crops grown, growing or to be grown, livestock born or unborn, supplies used or produced in farming operations, and products of crops or livestock in their unmanufactured state;

6.    All general intangibles, including all Intellectual Property;

4

7.   All proceeds of any crop insurance, price support payment or other government program;

8.   All rights and interests under Hedging Agreements, including all rights to the payment of money from Secured Parties under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in the Hedging Agreements;

9.   Accessions, attachments and other additions to the foregoing;

10.   Substitutes or replacements for any of the foregoing, all proceeds, products, rents and profits of any of the foregoing, all rights under warranties and insurance contracts covering any of the foregoing, and any causes of actions relating to any of the foregoing; and

11.   All books and records pertaining to any of the foregoing, including but not limited to any computer-readable memory and any computer hardware and software necessary to process such memory.

F.   The Loan Parties' Obligations under the Loans also are secured by properly perfected liens on and security interests in various real property and related improvements, fixtures, personal property, easements, water rights, timber, leases, plantings, rents and other real property (collectively, the **"Real Property"**) located in Deaf Smith and Parmer Counties, State of Texas, and in Marshall County, State of Kentucky, including the Real Property identified in the following Deeds of Trust and Mortgages (collectively, the **"Real Property Collateral"**):

1.   All Real Property identified in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith County, Texas)*, dated May 11, 2018, executed by MFY, as Grantor, in favor of RAF, as Beneficiary, and recorded in the Official Records of Deaf Smith County, Texas;

2.   All Real Property identified in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated July 24, 2018, executed by MFY and 7M, as Grantor, in favor of RAF, as Beneficiary, and recorded in the Official Records of Deaf Smith and Parmer Counties, Texas;

3.   All Real Property identified in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated July 24, 2019, executed by MFY and 7M, as Grantor, in favor of RAF, as Beneficiary, and recorded in the Official Records of Deaf Smith and Parmer Counties, Texas;

4.   All Real Property identified in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated January 8, 2020, executed by MFY and 7M, as Grantor, in favor of RAF, as Beneficiary, and recorded in the Official Records of Deaf Smith and Parmer Counties, Texas;

5.    All Real Property identified in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated March 16, 2021, executed by MFY and 7M, as Grantor, in favor of RAF, as Beneficiary, and recorded in the Official Records of Deaf Smith and Parmer Counties, Texas;

6.    All Real Property identified in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated August 27, 2021, executed by MFY and 7M, as Grantor, in favor of RAF, as Beneficiary, and recorded in the Official Records of Deaf Smith and Parmer Counties, Texas; and

7.    All Real Property identified in that certain *Mortgage, Assignment of Rents and Security Agreement (Marshall County, Kentucky)*, dated August 27, 2021, executed by B. McClain, as Grantor and Mortgagor, in favor of RAF, as Mortgagee, and recorded in the Official Records of Marshall County, Kentucky.

G.    The Personal Property Collateral and the Real Property Collateral are collectively referred to herein as the "**Rabo Collateral**."

H.    MF, MFY and 7M currently own and maintain demand deposit bank accounts at Mechanics Bank including Account No. 3505283070 in the name of MF, Account No. 469420423 in the name of 7M, and Account 819150197 in the name of MFY (collectively, the "**Mechanics Bank Accounts**"). RAF has a perfected lien on all funds in the Mechanics Bank Accounts pursuant to Deposit Account Control Agreements that were duly executed by Mechanics Bank, RAF, and each of MF, MFY and 7M.

I.    Crystal D. McClain ("**Crystal McClain**") is B. McClain's former spouse. Crystal McClain was formerly a guarantor of the Loans, and also was an owner and officer of MF, MFY and 7M. In or about September of 2020, B. McClain and Crystal McClain were officially divorced, and Crystal McClain thereafter (i) transferred all of her ownership interests in MF, MFY and 7M to B. McClain, and (ii) resigned her positions as an officer and/or director of MF, MFY, and 7M.

J.    RAF has since released Crystal McClain from the Master Loan Guaranty she signed under which she guaranteed the full performance and prompt payment when due of all Obligations owed on the Loans.

K.    Since no later than November of 2020, B. McClain has been the 100% shareholder of, and sole officer and director of, each of MF, MFY and 7M.

L.    B. McClain is currently married to Chelsea Marie McClain ("**Chelsea McClain**"). Chelsea McClain is not a borrower or guarantor of any of the Loans, has no ownership or other interest in any of MF, MFY or 7M, and is not a Loan Party under this Agreement. Chelsea McClain will sign this Agreement in the space provided below, however, to (a) acknowledge that she has no ownership or other legal or equitable interest in MF, MFY or 7M or any assets owned by MF, MFY or 7M, (b) provide her consent to the liens in the Rabo Collateral that have been granted to RAF under the Loan Documents to secure the Loan Parties' Obligations under the Loans, (c) subordinate any claims, rights or interests she has, if any, in MF, MFY, 7M or the

6

Rabo Collateral to the rights and claims of RAF against MF, MFY, 7M and the Rabo Collateral, and (d) agree that she is also a releasing party under the Release and Waiver of Claims provisions set forth in Section 5 of the Agreement.

M.       The Loan Parties acknowledge and agree that the Loans are cross-collateralized and cross-defaulted.  The Loan Parties further acknowledge and agree that one or more Events of Default, as defined in the Loan Documents, has occurred with respect to the Loans, which Events of Default entitle RAF to exercise all legal, equitable and contractual rights against the Loan Parties and against the Rabo Collateral, including but not limited to the right to immediate liquidation, foreclosure and sale of the Rabo Collateral and the exercise of RAF's rights against all funds in the Mechanics Bank Accounts.  The Loan Parties further acknowledge receipt of that certain *Notice of Default and Acceleration, Demand for Payment and Satisfaction in Full of all Obligations (Including but not Limited to all Secured Obligations and all Guaranteed Obligations, and Full Reservation of Rights* (the "**Notice**"), which was dated on April 6, 2023 and was delivered to them by RAF's outside counsel at Ray Quinney & Nebeker P.C.

N.       The Loan Parties acknowledge and agree that the Notice provided them with notice that Events of Default had occurred and are ongoing under the Loan Documents.  The Loan Parties further acknowledge and agree that, pursuant to the Notice, all Obligations due under the Loan Documents have been accelerated, and are now due and payable in full.

O.       The Loan Parties further acknowledge that, as a result of the Events of Default that currently exist under the Loan Documents, RAF has frozen the Mechanics Bank Accounts pursuant to the Deposit Account Control Agreements between Mechanics Bank, RAF and each of MF, MFY and 7M.

P.       The Loan Parties have requested that RAF forbear from further exercising RAF's rights and remedies under the Loan Documents and against the Rabo Collateral.  RAF is willing to do so, but only in accordance with the terms and conditions of this Agreement, including specifically the release by the Loan Parties of any claims against RAF as outlined in this Agreement, such release to be effective upon the execution of this Agreement.  RAF's forbearance shall continue so long as the Loan Parties remain in full compliance with all of the terms and conditions of this Agreement.

Q.       The Loan Parties jointly and severally agree and acknowledge that (1) they do not dispute and will not dispute the Outstanding Amounts Due as of the Payoff Calculation Date, (2) they do not dispute and will not dispute the additional interest (both contractual interest and default interest at the Default Rate), as well as attorney's fees and costs and other charges allowed by the Loan Documents, that will accrue on the Loans after the Payoff Calculation Date until such time as the Loans are paid and satisfied in full, pursuant to this Agreement or otherwise, (3) in the event RAF elects in its sole discretion to make additional protective advances, either to the Loan Parties or directly to third parties, for livestock, feed, care, maintenance, transportation, insurance, rent or other charges related to the Rabo Collateral, they will not dispute that the Loan Parties will owe additional sums, in an amount to be determined in the future, in the amount of such additional protective advances, plus any interest or other charges that may be owed under the Loan Documents as a result of such additional protective advances, and (4) as of the date of this Agreement, they have no defenses, offsets or claims

7

related to RAF or the Notice or the Events of Default, or related to or arising under the Loan Documents, the Loans, or the administration or servicing of the Loans.

**Agreement**

Now, therefore, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

1.     <u>The Events of Default Related to the Loans Will Remain in Effect during the Forbearance Period, but Subject to the Forbearance Outlined in this Agreement</u>.  The Loan Parties jointly and severally represent, acknowledge and agree as follows:  (a) the Events of Default that currently exist under the Loan Documents, as outlined in the Notice, have occurred and are presently existing and cannot be cured, the Events of Default are material Events of Default under the Loan Documents, the Events of Default apply to all of the Loans, and RAF therefore has the immediate right to exercise all rights given to it under the Loan Documents, applicable law or in equity concerning the Loan Parties or the Rabo Collateral that was pledged to secure the Loans, (b) RAF is in full compliance with all of the terms and conditions of the Loan Documents and all other documents related to the Loans as of the Closing Date, and (c) all of the Loans are payable in full as of the Closing Date, and the Loan Parties are unable to pay the Loans in full on the Closing Date.  The Loan Parties also jointly and severally represent, acknowledge and agree that they do not and will not contest the foregoing, that they do not contest RAF's immediate right to exercise all rights given to it under the Loan Documents, applicable law or in equity concerning the Loan Parties or the Rabo Collateral, and they will not assert any defenses or offsets to the fact that the Events of Default have occurred and are continuing material Events of Default under the Loan Documents.  The Loan Parties also jointly and severally acknowledge and agree that RAF is entitled to take any and all actions under the Loan Documents or applicable law during the Forbearance Period that RAF deems necessary to protect its rights and interests in the Rabo Collateral.

2.     <u>Immediate Appointment of Ampleo as CRO for MF, MFY and 7M</u>.  By no later than Monday, April 10, 2023, the Loan Parties shall formally retain CFO Solutions, LLC dba Ampleo ("**Ampleo**") as the Chief Restructuring Officer for each of MF, MFY and 7M (individually and collectively, the "**Companies**"), and as the sole officer and director for each of the Companies (Ampleo acting in these capacities is referred to herein as the "**CRO**"), and CRO shall have sole authority  to manage, control and oversee all of the funds of the Companies, including all funds dispersed or to be dispersed and all funds deposited or to be deposited, and all funds or proceeds from the sale or other liquidation of the Rabo Collateral.  Further, the Loan Parties shall not sell, transfer, gift, encumber, hypothecate, move, or otherwise impair the value of any of Rabo Collateral, including without limitation any equipment, rolling stock, or farm products (including livestock and feed) of the Companies, without the express written consent of Ampleo.  Additionally, any agreement between the Loan Parties and Ampleo, shall contain at least the following provisions:

A.     Ampleo shall be authorized to perform the duties of the CRO of each of the Companies , and shall have sole and exclusive authority to manage, control and oversee  all of the funds of the Companies, including all of the proceeds from the sale of the Rabo Collateral,

8

subject to oversight of RAF and in consultation with the Loan Parties.  Further, Ampleo shall have exclusive authority and control over the Companies' bank accounts (including but not limited to the Mechanics Bank Accounts), and over all of the books and financial records of the Companies.

     B.    The Loan Parties shall not purchase any assets (including any equipment or farm products, including livestock or feed) without the express written consent of Ampleo.  Further, as noted above, the Loan Parties shall not sell, transfer, gift, encumber, hypothecate, move or otherwise impair the value of any Rabo Collateral without the express written consent of Ampleo.

     C.    Glenn Karlberg of Ampleo shall be designated as the CRO.  Other Ampleo associates may be called upon to assist if needed at the CRO's discretion.  Mr. Karlberg and his Ampleo associates are referred to herein as the "**CRO Team.**"  Except as otherwise provided, the CRO Team shall have sole authority and control over the banking, financial, accounting, and record keeping needs of the Companies, and shall specifically endeavor to improve accounting, record keeping and financial controls at the Companies The CRO shall have authority to provide such periodic reports to RAF as the CRO deems appropriate or as requested by RAF.  Neither the CRO nor the CRO Team shall have any responsibility to file any federal, state or local tax returns for any of the Loan Parties, but the CRO may provide oversight as needed for the reporting and filing of the returns by the appropriate employees of the Companies.  In the event RAF requests the appointment of a receiver for one or more of the Companies, the Loan Parties stipulate, acknowledge and agree that Ampleo may serve as the receiver, and the Loan Parties shall not contest or challenge Ampleo's appointment.

     D.    The CRO shall have sole authority, control and management of all of the funds of the Companies.  The Loan Parties shall immediately turn over access to all bank accounts to the CRO, and shall provide to the CRO all of the financial and operating information and documentation concerning the Companies' business operations and the Rabo Collateral that the CRO shall request from the Loan Parties from time to time.  Further, the CRO shall have sole and exclusive signature control of all of the Companies' bank and other financial accounts, including the Mechanics Bank Accounts.

     E.    The CRO shall be authorized to purchase feed and other supplies and to pay salaries and to pay the ongoing expenses of running the Companies' businesses.

     F.    The Companies may need additional cash (the "**Cash Shortfall**") to fund the Companies' operations during the forbearance period.  To fund the Cash Shortfall, RAF may make additional over-advances and protective advances under RAF's Operating Line of Credit.  If and to the extent RAF elects in its sole and absolute discretion to make such advances, then such advances shall be deemed to have been made under and pursuant to the terms of the Loan Documents and shall be further deemed to have been made as protective advances in order to protect the Rabo Collateral that secures the Loans (such advances being referred to herein as the "**Protective Advances**").  The timing, amount and frequency of any Protective Advances shall be in RAF's sole and absolute discretion.  If and to the extent RAF agrees to make any Protective Advances, the Loan Parties each jointly and severally agree and acknowledge that they will not

9

dispute RAF's right to be repaid for the Protective Advances and that Default Interest shall accrue on the Protective Advances from the times that such funds are advanced until repaid in full.

G.     The CRO is authorized by the Loan Parties to communicate with RAF as requested by RAF, including providing written or oral status reports.  If requested, the CRO is also authorized to provide to RAF copies of the Companies' Quick Books files.  Further, if requested, the CRO is also authorized to provide RAF with copies of the Loan Parties' federal and state tax returns, including all schedules, for all tax years.

H.     The CRO is authorized to provide RAF with one or more rolling cash-flow budgets to cover anticipated expenses during the forbearance period, as well as such other banking, financial and accounting information concerning the Companies that RAF may request. Absent the express written consent of both RAF and the CRO, no cattle or other livestock will be purchased during the forbearance period.

I.     The Loan Parties shall at all times fully cooperate with the CRO Team and shall take no action which interferes, directly or indirectly, with the duties of the CRO as outlined in this Agreement or in any separate agreements between the Loan Parties and Ampleo..

J.     The Loan Parties shall at all times act in good faith to support the CRO Team in performing its duties, and shall provide the CRO Team with access to all books and records related to the Companies, including but not limited to, all banking and accounting records, contracts for services to be provided by Companies, union contracts, licenses, permits, applications, purchase and sale agreements, and insurance policies.  The Loan Parties shall cooperate to ensure that books, records and accounts help by outside parties are turned over to the CRO.  The Companies' owners, agents, and employees shall fully and timely cooperate with the CRO in connection with the performance of its duties, and shall not interfere with the CRO's performance of such duties.  In the event a dispute arises between the CRO and the Loan Parties, or any existing or former owner, officer, agent, or employee of the Companies, regarding their compliance with this paragraph, the CRO shall have the right to seek a Court order, on five (5) business days' notice, enforcing the terms of this Agreement.

K.     The Companies shall indemnify the CRO Team on the same terms as provided to its other officers and directors under the Companies' articles, bylaws, operating agreements, company agreements or other company governing documents (e.g., board, manager, member or shareholder resolutions) (collectively, the "**Governing Documents**") and applicable state law and can and will provide insurance coverage for the CRO and the CRO Team under its D&O policy. In the event the Companies do not currently have a D&O policy, the CRO may acquire a D&O policy which provides insurance coverage for the CRO and the CRO Team on terms typical in the industry in which the Companies operate.

L.     RAF may, in its sole discretion, but shall have no obligation to, advance to the Companies funds necessary to pay all amounts payable to the CRO.  All such advances, if agreed to by RAF in the future, shall be considered by the Parties as Protective Advances made pursuant to the terms of the Loan Documents, and shall be secured by the Rabo Collateral.

M.     The Loan Parties may only terminate the CRO Team, with or without cause, upon giving no less than thirty (30) days advanced written notice to both RAF and the CRO.

3.     <u>Forbearance Period; Event of Termination; Preconditions to Forbearance.</u>

A.     Expressly conditioned upon the satisfaction of all of the conditions to the effectiveness of this Agreement before this Agreement becomes effective, and further subject to the continuing satisfaction of all of the terms and conditions set forth in this Agreement, RAF hereby agrees to forbear from the Closing Date until an Event of Termination (as defined below) occurs (referred to herein as the **"Forbearance Period"**) from its immediate right to exercise all rights given to it under the Loan Documents, applicable law or in equity with respect to the Loans and concerning the Loan Parties and/or the Rabo Collateral. The forbearance provided by RAF pursuant to this Agreement is conditioned upon the following, the failure of any of which shall constitute an Event of Termination: (i) this Agreement has been fully executed by all of the Loan Parties, (ii) the Loan Parties provide RAF with all other documentation required by RAF to be provided in connection with this Agreement, and (iii) the Loan Parties shall cooperate fully with Ampleo and will immediately provide to Ampleo all of the financial and operating information and documentation concerning the Companies' business operations that Ampleo shall request from the Loan Parties from time to time, and RAF authorizes the Loan Parties to release to Ampleo all of the requested financial and operating information and documentation concerning the Companies' business operations.

B.     The Forbearance Period provided by this Agreement shall terminate, without notice to any of the Loan Parties, upon the occurrence of any Event of Termination. The term **"Event of Termination"** means the occurrence of any of the following events: (i) a Forbearance Default has occurred and has not been cured within the cure period outlined above, (ii) any of the Loan Parties fails to meet or satisfy any of the conditions to the effectiveness of this Agreement, or fails to satisfy any other agreement, covenant or condition outlined in this Agreement, or the occurrence of any other event outlined in this Agreement which is stated to be an Event of Termination, and any of the foregoing is not cured (if it can be cured) by the end of the cure period outlined above, or (iii) the end of the Forbearance Period, which is **May 1, 2023**.

C.     Upon the occurrence of any Event of Termination, without releasing, waiving, impairing, or otherwise affecting the Loan Parties' respective warranties, covenants, agreements, consents and waivers under this Agreement and the other Loan Documents, RAF may in its sole and absolute discretion, without any demand, presentment, protest or notice (all of which each of the Loan Parties hereby waives) exercise any and all of the rights, remedies, powers, and privileges available to RAF under the Loan Documents, or pursuant to applicable law or in equity, with respect to the Loan Parties, the Loans, the RAF Indebtedness, and/or the Rabo Collateral.

3.     <u>The Loan Parties' Obligations Under the Loan Documents are Absolute and Unconditional.</u>  Each of the Loan Parties hereby ratifies and confirms all of the Loan Documents and the RAF Indebtedness in all respects as of the Closing Date, except as expressly waived or modified by this Agreement. The Loan Parties hereby jointly and severally represent,

acknowledge and agree that their obligations to pay and perform all of their Obligations under the Loan Documents and to satisfy all of their duties under the Loan Documents are absolute and unconditional, and there exists no right of set-off or recoupment, counterclaim or defense of any kind or nature whatsoever to payment and performance of the RAF Indebtedness and fulfillment of the Loan Parties' duties under the Loan Documents.

4.    Notice of Occurrence of a Forbearance Default and Cure Period.  The term "**Forbearance Default**" shall mean the occurrence of any one or more of the following:  (a) the Loan Parties fail or refuse to comply with any of the obligations or duties or covenants imposed upon them under this Agreement and under the other Loan Documents (except to the extent such obligations or duties or covenants are expressly waived, modified or forgiven by this Agreement), (b) any representation or warranty made by any of the Loan Parties in this Agreement is deemed by RAF to be materially incorrect or misleading,  or (c) the occurrence of any event that will become an Event of Termination under this Agreement if not cured on a timely basis as outlined below.  Notwithstanding anything to the contrary in the Loan Documents, RAF shall provide to the Borrowers written notice of any Forbearance Default, and the Borrowers shall have five (5) calendar days to cure the Forbearance Default (if such Forbearance Default can be cured) before such Forbearance Default shall become an Event of Termination under this Agreement.

5.    Release and Waiver of Claims.  THE LOAN PARTIES, JOINTLY AND SEVERALLY, BOTH FOR THEMSELVES AND FOR ALL PERSONS OR ENTITIES CLAIMING BY, THROUGH OR UNDER THEM, HEREBY WAIVE, RELEASE AND FULLY DISCHARGE RAF, AND RAF'S PARENTS, SUBSIDIARIES, AFFILIATES, PREDECESSORS, SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS, ATTORNEYS, EMPLOYEES AND REPRESENTATIVES (COLLECTIVELY, THE "**RELEASED PARTIES**") FROM ANY AND ALL MANNER OF CLAIMS, ACTIONS, CAUSES OF ACTION IN LAW OR IN EQUITY, SUITS, DEBTS, LIENS, CONTRACTS, LIABILITIES, CLAIMS, DEMANDS, DAMAGES, LOSSES, FEES, COSTS, EXPENSES, SET OFFS, OR CLAIMS FOR RECOUPMENT, OF ANY NATURE WHATSOEVER, KNOWN OR UNKNOWN, FIXED OR CONTINGENT THAT ANY OF THE LOAN PARTIES HAVE OR MAY HAVE OR CLAIM AGAINST THE RELEASED PARTIES, FROM THE BEGINNING OF TIME TO THE DATE OF EXECUTION OF THIS AGREEMENT, BASED UPON ANY CONDUCT, CLAIMS, ACTIONS OR OMISSIONS OF THE RELEASED PARTIES RELATING OR PERTAINING IN ANY WAY TO THE LOANS, THE LOAN DOCUMENTS, THE RAF INDEBTEDNESS, THE NOTICE, RAF'S EXERCISE OF RIGHTS UNDER DEPOSIT ACCOUNT CONTROL AGREEMENTS, THE NEGOTIATIONS RELATING TO THIS AGREEMENT, OR ANY OTHER ACT OR OMISSION THAT HAS OCCURRED PRIOR TO THE EXECUTION OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS OR CAUSES OF ACTION FOR USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR CONTRACT OR AT EQUITY, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

6.    Loan Parties' Representations and Warranties.  The Loan Parties hereby jointly and severally represent and warrant to RAF as follows:

12

A.  <u>Recitals</u>.  The Recitals in this Agreement are true and correct in all material respects and are hereby incorporated into the binding agreements outlined in this Agreement.

B.  <u>Incorporation of Representations</u>.  There has been no material change in the management or ownership structure of MF, MFY or 7M since January 1, 2023.  No Loan Party is the subject of any Judgment (as defined in the Loan Documents), and there is no lawsuit, tax claim or other dispute pending against any Loan Party.

C.  <u>Power and Authority</u>.  The execution, delivery, and performance of this Agreement by each of the Loan Parties has been duly authorized by all necessary action, and does not and will not contravene any governing documents of any of the Loan Parties, violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree or determination presently in effect having applicability to any of the Loan Parties, result in a breach of or constitute a default under any promissory note, mortgage, indenture, loan or credit agreement, or any other agreement, lease or instrument to which any of the Loan Parties is a party or by which its or his or her assets or properties may be bound or affected, or result in or require the creation or imposition of any Lien as defined in the Loan Documents (other than any Lien created in favor of RAF under the Loan Documents), upon or with respect to any of the properties now owned or hereafter acquired by such Loan Parties.

D.  <u>Legally Enforceable Agreement</u>.  This Agreement is, and each other document delivered in connection with this Agreement, will be legal, valid and binding obligations of the Loan Parties, enforceable against each of the Loan Parties in accordance with their respective terms, except to the extent that the enforcement may be limited by applicable bankruptcy, insolvency, and other similar laws affecting creditors' rights generally.

E.  <u>No Assignment or Transfer of Any Claim</u>.  There has been no assignment or other transfer of a claim, cause of action or other liability which might affect or impair the releases set forth in this Agreement, and no Loan Party has filed or asserted any claims concerning the subject matter of this Agreement that are not covered by this Agreement.

7.  <u>Bankruptcy Waiver</u>.  IN THE EVENT ONE OR MORE OF THE LOAN PARTIES FILES A VOLUNTARY PETITION FOR RELIEF UNDER THE BANKRUPTCY CODE OR ANY STATE INSOLVENCY OR RECEIVERSHIP LAWS OR IN THE EVENT AN INVOLUNTARY PETITION IS FILED AGAINST ONE OR MORE OF THE LOAN PARTIES UNDER THE BANKRUPTCY CODE OR ANY STATE INSOLVENCY OR RECEIVERSHIP LAWS AND SUCH INVOLUNTARY PETITION IS NOT DISMISSED WITHIN THIRTY (30) DAYS OF FILING, EACH OF THE LOAN PARTIES HEREBY EXPRESSLY AND KNOWINGLY WAIVES ANY AND ALL PROTECTIONS UNDER THE AUTOMATIC STAY IMPOSED BY THE BANKRUPTCY CODE OR ANY STATE LAWS IMPOSING A STAY SIMILAR TO THAT CONTAINED IN THE BANKRUPTCY CODE, AND HEREBY AGREES NOT TO OPPOSE OR DEFEND AGAINST ANY MOTION OR PETITION BY RAF (WHICH MAY BE MADE EX PARTE) FOR AN IMMEDIATE MODIFICATION, TERMINATION, OR ANNULMENT OF THE AUTOMATIC STAY OR

13

OTHER RELIEF FROM THE AUTOMATIC STAY WITH RESPECT TO THE RABO COLLATERAL AND ANY OTHER COLLATEARL NOW OR HEREAFTER GRANTED IN CONNECTION WITH THE LOAN DOCUMENTS.

8.    Jury Waiver.  THE LOAN PARTIES HEREBY JOINTLY AND SEVERALLY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THE RAF INDEBTEDNESS, THE LOANS, THE LOAN DOCUMENTS, THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

9.    No Commitment.  EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, RAF IS NOT COMMITTED, AND IS NOT COMMITTING, TO EXTEND, MODIFY OR OTHERWISE RESTRUCTURE THE LOANS, OR FORBEAR FROM EXERCISING ANY OF ITS RIGHTS OR REMEDIES UNDER THE LOAN DOCUMENTS OR UNDER APPLICABLE LAW OR IN EQUITY.  NO PRIOR COURSE OF DEALING, NO USAGE OF TRADE, AND NO ORAL STATEMENTS OR COMMENTS BY RAF OR ITS OFFICERS, EMPLOYEES, ATTORNEYS OR OTHER AGENTS WILL BE DEEMED TO BE A COMMITMENT BY RAF TO EXTEND, MODIFY, OR OTHERWISE RESTRUCTURE THE LOANS OR FORBEAR FROM EXERCISING ANY OF RAF'S RIGHTS OR REMEDIES, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, OR UNLESS THE SAME SHALL BE REDUCED IN WRITING AND SIGNED BY AUTHORIZED REPRESENTATIVES OF RAF.

10.    Document Understood.  BY THEIR SIGNATURES BELOW, EACH OF THE LOAN PARTIES ACKNOWLEDGES AND AGREES THAT: (A) THIS AGREEMENT CONTAINS A COMPLETE WAIVER AND RELEASE BY EACH OF THE LOAN PARTIES OF CERTAIN CLAIMS AND A WAIVER OF CERTAIN RIGHTS; AND (B) EACH OF THE LOAN PARTIES HAS READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY PRIOR TO SIGNING AND FULLY AGREES TO EACH, ALL AND EVERY PROVISION OF THIS AGREEMENT.

11.    Effectiveness.  Except to the extent specifically amended or modified or waived by the terms of this Agreement, all of the terms, conditions and provisions of the Loan Documents will remain unmodified, and the Loan Documents, to the extent amended or otherwise affected by the specific terms of this Agreement, remain in full force and effect.  All references to the Loan Documents in this Agreement or in any other document or instrument between any of the Loan Parties and RAF will be construed to be references to the Loan Documents to the extent modified or waived by the specific terms of this Agreement.

12.    No Waiver.  The Loan Parties agree that nothing in this Agreement is intended, nor should it be construed, as (A) an extension of the Maturity Dates for the Loans, a commitment by RAF to make any new loan, or to grant or extend any financial accommodations to Loan Parties (other than those forbearance accommodations expressly stated in this Agreement), (B) a commitment by RAF to restructure the Loans or any of the other Loan Documents, or to grant any financial accommodations with respect to the same (other than those forbearance accommodations expressly stated in this Agreement), (C) a commitment by RAF to accept any future proposal submitted by the Loan Parties, whether in the form submitted or in

any negotiated or modified form, or (D) a waiver or a modification of or a forbearance from exercising any of RAF's rights, powers, remedies, and privileges in law and/or in equity under and with respect to the Loans or the Loan Documents, or otherwise (other than those forbearance accommodations expressly stated in this Agreement). This Agreement does not constitute a waiver of rights with respect to the existing Events of Default, but only constitutes a forbearance with respect to the existing Events of Default, and RAF shall be entitled to exercise all of its rights and remedies upon the occurrence of an Event of Termination under this Agreement. It is expressly understood and agreed in this Agreement that any actions required herein and the absence of any other action at this time or at any time or times hereafter, or not to otherwise require strict performance of any provision of this Agreement or any other of the Loan Documents, shall not waive, affect or diminish the rights of RAF to thereafter and that hereafter demand strict compliance and performance therewith, and shall not suspend, waive or affect any right, power or remedy granted to RAF under this Agreement or any other of the Loan Documents. RAF fully reserves all rights and remedies available to it regarding the Loans, the Loan Parties, all Rabo Collateral and any other property or assets that have been pledged to secure the Loans, and all related matters, including but not limited to the right to pursue any and all legal or equitable claims against the Loan Parties, the right to seek a receiver over some or all of the Rabo Collateral or any other property and assets that have been pledged to secure the Loans, and the right to otherwise enforce its liens and security interests in the Rabo Collateral and any other property and assets have been pledged to secure the Loans, and the failure of RAF to exercise any such rights and remedies, either now or in the future, shall not be deemed a waiver by RAF of any rights or remedies that are or may become available to it, all of which are fully preserved.

13.    Integration. This Agreement supersedes any prior understandings or agreements between the Parties, whether written or verbal, respecting the subject matter of this Agreement and contains the entire understanding of the Parties with respect thereto.

14.    Governing Law, Jurisdiction and Venue. This Agreement shall be subject to the governing law provisions found in the Loan Documents, which provisions are incorporated herein by reference.

15.    Effectuation of Agreement. The Parties agree to perform any other or further acts, and execute and deliver any other or further documents, as may be necessary or appropriate to implement this Agreement.

16.    Construction of Agreement. This Agreement shall be construed as a whole in accordance with its fair meaning and in accordance with governing law. This Agreement has been negotiated by each of the Parties (or their respective counsel) and the language of the Agreement shall not be construed for or against any particular Party.

17.    Counterparts. This Agreement may be executed in any number of identical counterparts, each of which, once executed and delivered in accordance with the terms of this Agreement, will be deemed an original, with all such counterparts taken together constituting one and the same instrument. Delivery by facsimile, encrypted e-mail or e-mail file attachment of any such executed counterpart to this Agreement will be deemed the equivalent of the delivery

of the original executed agreement or instrument.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Forbearance Agreement as of the Closing Date first above written.

<u>LOAN PARTIES:</u>

**McCLAIN FEED YARD, INC.**, a Texas corporation

By: _____
Name: Brian Keith McClain
Title: President & Owner

**McCLAIN FARMS, INC.**, a Kentucky corporation

By: _____
Name: Brian Keith McClain
Title: President & Owner

**7M CATTLE FEEDERS, INC.**, a Kentucky corporation

By: _____
Name: Brian Keith McClain
Title: President & Owner

**BRIAN KEITH McCLAIN**, an individual

<u>RAF/LENDER/RABO:</u>

**RABO AGRIFINANCE LLC**, a Delaware limited liability company

By: _____
Its: _____

16

## SPOUSAL CONSENT, WAIVER AND RELEASE OF CLAIMS

By her signature below, Chelsea Marie McClain hereby acknowledges and agrees as follows:

1.     That she is the current spouse of Brian Keith McClain;

2.     That she holds no ownership or other legal or equitable interest in, and is not an officer or director of, any of the Loan Parties;

3.     That she has no ownership interest in, or other legal or equitable rights or claims to, the property constituting the Rabo Collateral;

4.     That, to the extent required by contract or law, she consents to the liens granted to RAF under the Loan Documents to secure the Loan Parties' Obligations to RAF under the Loans, and agrees not to challenge the nature, extent, validity or priority of such liens in any legal proceeding;

5.     That, to the extent she has rights against, liens on or interests in any of Loan Parties or the Rabo Collateral, she hereby subordinates all such rights against, liens on or interests she may have in such assets and property to RAF's rights, claims, and liens against the Loan Parties and the Rabo Collateral; and

6.     THAT SHE HEREBY WAIVES, RELEASES AND FULLY DISCHARGES RAF, AND RAF'S PARENTS, SUBSIDIARIES, AFFILIATES, PREDECESSORS, SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS, ATTORNEYS, EMPLOYEES AND REPRESENTATIVES (COLLECTIVELY, THE "**RELEASED PARTIES**") FROM ANY AND ALL MANNER OF CLAIMS, ACTIONS, CAUSES OF ACTION IN LAW OR IN EQUITY, SUITS, DEBTS, LIENS, CONTRACTS, LIABILITIES, CLAIMS, DEMANDS, DAMAGES, LOSSES, FEES, COSTS, EXPENSES, SET OFFS, OR CLAIMS FOR RECOUPMENT, OF ANY NATURE WHATSOEVER, KNOWN OR UNKNOWN, FIXED OR CONTINGENT THAT SHE HAS OR MAY HAVE OR CLAIM TO HAVE AGAINST THE RELEASED PARTIES, FROM THE BEGINNING OF TIME TO THE DATE OF EXECUTION OF THIS AGREEMENT, BASED UPON ANY CONDUCT, CLAIMS, ACTIONS OR OMISSIONS OF THE RELEASED PARTIES RELATING OR PERTAINING IN ANY WAY TO THE LOANS, THE LOAN DOCUMENTS, THE RAF INDEBTEDNESS, THE NOTICE, RAF'S EXERCISE OF RIGHTS UNDER DEPOSIT ACCOUNT CONTROL AGREEMENTS, THE NEGOTIATIONS RELATING TO THIS AGREEMENT, OR ANY OTHER ACT OR OMISSION THAT HAS OCCURRED PRIOR TO THE EXECUTION OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS OR CAUSES OF ACTION FOR USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR CONTRACT OR AT EQUITY, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

By: _Chelsea Marie McClain_
Name: Chelsea Marie McClain
Dated: April 11th 2023

Obligation No. 22122952/22122953 (Operating Line of Credit 3)
Obligation No. 22114181 (Real Estate Term Loan 1)
Obligation No. 22117432 (Real Estate Term Loan 2)
Obligation No. 22122951/0000030687 (Real Estate Term Loan 3)

## FIRST AMENDMENT TO AMENDED AND RESTATED FORBEARANCE AGREEMENT

This *First Amendment to Amended and Restated Forbearance Agreement* (the "**Amendment**") is made and entered into as of April 12, 2023 (the "**Closing Date**"), by and among each of MCCLAIN FEED YARD, INC., a Texas corporation ("**MFY**"), MCCLAIN FARMS, INC., a Kentucky corporation ("**MF**"), 7M CATTLE FEEDERS, INC., a Kentucky corporation ("**7M**"), and BRIAN KEITH MCCLAIN, a married person or member of a civil union or domestic partnership ("**B. McClain**"), each of which is a Borrower and/or Guarantor under the Loan and Security Documents identified below, on the one hand, and RABO AGRIFINANCE LLC, a Delaware limited liability company ("**RAF**" or "**Rabo**" or "**Lender**"), as the Lender under the Loan and Security Documents identified below, on the other hand. MFY, MF, 7M, and B. McClain shall be referred to herein collectively as the "**Loan Parties,**" and individually as a "**Loan Party.**" The Loan Parties and RAF shall be referred to herein collectively as the "**Parties.**"

### Recitals

A.    RAF and the Loan Parties have entered into that certain *Forbearance Agreement* as amended and restated by that certain *Amended and Restated Forbearance Agreement* (collectively, the "**Forbearance Agreement**") made and entered into effective as of April 9, 2023, with respect to certain loans and extensions of credit (collectively, the "**Loans**") made by RAF to the Loan Parties and evidenced by certain notes, facility sheets, credit agreements, security agreements, deeds of trust, mortgages, financing statements and other documents, all are more fully described and collectively referred to in the Forbearance Agreement as the Loan Documents.

B.    Under the Forbearance Agreement, RAF agreed to voluntarily forbear during the Forbearance Period from its immediate right to exercise all rights given to it under the Loan Documents, Applicable Law or in equity with respect to the Loans and concerning the Loan Parties or the Rabo Collateral securing the Obligations and RAF Indebtedness due under the Loan Documents.

C.    Under the Forbearance Agreement, RAF's forbearance automatically terminates if an "Event of Termination" occurs. The Forbearance Agreement defines "Event of Termination" as any of the following events: (i) a Forbearance Default has occurred and has not been cured within the cure period outlined in the Forbearance Agreement, (ii) any of the Loan Parties fails to meet or satisfy any of the conditions to the effectiveness of the Forbearance Agreement, or fails to satisfy any other agreement, covenant or condition outlined in the Forbearance Agreement, or the occurrence of any other event outlined in the Forbearance Agreement which is stated to be an

Event of Termination, and any of the foregoing is not cured (if it can be cured) by the end of the cure period outlined in the Forbearance Agreement, or (iii) the end of the Forbearance Period, which is stated to be May 1, 2023.

D.    RAF contends that one or more Events of Termination have occurred under the Forbearance Agreement.

E.    The Loan Parties have requested that RAF waive any Forbearance Defaults and Events of Termination that may exist under the Forbearance Agreement as of the Closing Date, and further extend the end of the Forbearance Period to June 30, 2023.

F.    RAF is willing to waive any Forbearance Defaults and Events of Termination that may exist under the Forbearance Agreement as of the Closing Date, and further extend the end of the Forbearance Period as requested by the Loan Parties, but only upon the further terms and conditions set forth in this Amendment.

## AGREEMENT

Now, therefore, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Waiver of Existing Forbearance Defaults and Events of Termination.  As of the Closing Date, except as otherwise set forth in this Amendment, and expressly conditioned on the other terms and conditions of this Amendment, RAF waives any and all Forbearance Defaults and Events of Termination that exist or may exist under the Forbearance Agreement.

2.    Amendment and Restatement of Paragraph 2 of the Forbearance Agreement.  As partial consideration for RAF's temporary forbearance and the additional consideration set forth herein, paragraph 2 of the Forbearance Agreement is amended and restated in its entirety to provide as follows:

2.    Immediate Modification of Engagement of Ampleo as CRO for MF, MFY and 7M.  By no later than Friday, April 14, 2023, the Loan Parties shall formally expand the scope of authority of CFO Solutions, LLC dba Ampleo ("**Ampleo**") as the Chief Restructuring Officer for each of MF, MFY and 7M, and as the sole officer and director for each of MF, MFY and 7M (Ampleo acting in these capacities is referred to herein as the "**CRO**"), and Ampleo shall have sole authority to run the businesses of MF, MFY and 7M and conduct a liquidation of Rabo's Collateral, collect any account receivable or other amounts due including any litigation deemed desirable by RAF and manage all of the funds of MF, MFY and 7M.  Any amended agreement between the Loan Parties and Ampleo, shall contain at least the following provisions:

A.    With respect to each of MF, MFY and 7M (individually and collectively, the "**Companies**") the CRO shall be authorized to manage the business and operational affairs of the Companies, with the sole authority to run the

2

Companies' businesses and conduct the liquidation of the Companies' assets in a reasonable and prudent matter, and to manage all of the funds of the Companies.

B. The CRO shall be the sole officer and sole director of each of the Companies. Glenn Karlberg of Ampleo shall be designated as the CRO. Other Ampleo associates may be called upon to assist if needed at the CRO's discretion. Mr. Karlberg and any Ampleo associates he uses to assist him are referred to herein as the "**CRO Team.**" Except as otherwise provided, the CRO Team shall have sole authority over the operational, employment, accounting, and record keeping needs of the Companies. The CRO Team shall have authority to sell all or any portion of Rabo's Collateral that the CRO Team deems necessary or appropriate, on terms consented to by RAF, and RAF agrees to provide such consent (if the proposed terms are agreeable to RAF) in connection with its release of RAF's liens and security interests in the items of Rabo Collateral that are being sold. The CRO shall have the authority to provide such reports to RAF as the CRO deems appropriate or as requested by RAF. Neither the CRO nor the CRO Team shall have any responsibility to file any federal, state or local tax returns, but the CRO may provide oversight as needed for the reporting and filing of the returns by the appropriate employees of the Companies. The CRO shall have sole authority on behalf of the Companies to consent to the appointment of a receiver, or to file a petition or consent to an order for relief under Title 11 of the United States Code. Further, in the event RAF requests the appointment of a receiver for one or more of the Companies, the Loan Parties stipulate, acknowledge and agree that Ampleo may serve as the receiver, and the Loan Parties shall not contest or challenge Ampleo's appointment.

C. The Loan Parties shall immediately provide to the CRO all of the financial and operating information and documentation concerning the Companies' business operations and the Rabo Collateral that the CRO shall request from the Loan Parties from time to time, and the CRO shall have sole and exclusive signature control of all of the Companies' bank and other financial accounts, including the Mechanics Bank Accounts.

D. The CRO shall be authorized to purchase supplies and to pay the ongoing expenses of running the Companies' businesses during the full period of the liquidation of the Rabo Collateral, including the use of any funds generated during the liquidation process.

E. The Companies may need additional cash (the "**Cash Shortfall**") to fund the Companies' operations during the liquidation. To fund the Cash Shortfall, RAF may make additional over-advances and protective advances under RAF's Operating Line of Credit. If and to the extent RAF elects in its sole and absolute discretion to make such advances, then such advances shall be deemed to have been made under and pursuant to the terms of the Loan

3

Documents and shall be further deemed to have been made as protective advances in order to protect the Rabo Collateral that secures the Loans (such advances being referred to herein as the "**Liquidation Period Over-Advances/Protective Advances**"). The timing, amount and frequency of any Liquidation Period Over-Advances/Protective Advances shall be in RAF's sole and absolute discretion. If and to the extent RAF agrees to make Liquidation Period Over-Advances/Protective Advances, the Loan Parties each jointly and severally agree and acknowledge that they will not dispute RAF's right to be paid the Liquidation Period Over-Advances/Protective Advances and that Default Interest shall accrue on the Liquidation Period Over-Advances/Protective Advances from the times that such funds are advanced until repaid in full.

F.  The CRO shall be authorized to submit to RAF written status reports that provide information on (i) the progress that is being made with the liquidation, (ii) the amounts of the liquidation proceeds received by the CRO, (iii) the payments made by the CRO, and (iv) the status of the remaining Rabo Collateral and the anticipated timetable for the liquidation of the remaining Rabo Collateral. If requested, the CRO is also authorized to provide to RAF copies of any files, records or tax returns of the Loan Parties.

G.  The CRO shall be authorized to provide RAF with information regarding the amount of the Companies' payroll and contemplated payroll withholdings, broken down by employee, by no later than two (2) business days prior to the day that each payroll will be funded by the CRO from funds on hand. All payroll withholdings and taxes shall immediately be placed in a separate account from the Companies' general accounts, and held in trust for the benefit of the United States, the applicable state, and other governmental entities. The CRO shall timely remit all payroll withholdings and taxes as required by law, and shall promptly provide RAF with proof of the Companies' compliance with this requirement. The CRO also shall timely continue to pay for any licensing, permits or authorizations that may be required to continue the Company's operations.

H.  Should one or more of the Companies become a debtor under Chapter 11 of the Bankruptcy Code, the CRO shall provide services to the Companies until its retention to assist with the bankruptcy proceedings on behalf of the Companies is approved or disapproved by the court or until the CRO's services have been transitioned to another firm.

I.  All current officers of the Companies shall resign as officers or directors, and shall hold no office with the Companies.

J.  The Loan Parties shall at all times fully cooperate with the CRO Team and shall take no action which interferes, directly or indirectly, with the duties of the CRO as outlined in this Agreement or in any separate agreements between

4

the Loan Parties and Ampleo. Among other things, the CRO shall solely have all of the powers and authority granted to the officers and/or directors of the Companies, and no other former officer or director may exercise any power or authority without the consent of the CRO. No former officer or director of the Company shall take any action contrary to the actions of the CRO, or the provisions of this Agreement or any separate agreement between the Loan Parties and Ampleo.

K. The Loan Parties shall at all times act in good faith to support the CRO Team in performing its duties, and shall provide the CRO Team with access to all books and records related to the Companies, including but not limited to, all accounting records, contracts for services to be provided by Companies, union contracts, licenses, permits, applications, purchase and sale agreements, and insurance policies. The Loan Parties shall cooperate to ensure that books, records and accounts help by outside parties are turned over to the CRO. The Companies' owners, agents, and employees shall fully and timely cooperate with the CRO in connection with the performance of its duties, and shall not interfere with the CRO's performance of such duties. In the event a dispute arises between the CRO and the Loan Parties, or any existing or former owner, officer, agent, or employee of the Companies, regarding their compliance with this paragraph, the CRO shall have the right to seek a Court order, on five (5) business days' notice, enforcing the terms of this Agreement.

L. The Companies shall indemnify the CRO Team on the same terms as provided to its other officers and directors under the Companies' articles, bylaws, operating agreements, company agreements or other company governing documents (e.g., board, manager, member or shareholder resolutions) (collectively, the "**Governing Documents**") and applicable state law and can and will provide insurance coverage for the CRO, the Chief CRO and the Assistant CRO under its D&O policy. In the event the Companies do not currently have a D&O policy, the CRO may acquire a D&O policy which provides insurance coverage for the CRO, the Chief CRO and the Assistant CRO on terms typical in the industry in which the Companies operate.

M. RAF may, in its sole discretion, but shall have no obligation to, advance to the Companies funds necessary to pay all amounts payable to the CRO. All such advances, if agreed to by RAF in the future, shall be considered advances made pursuant to the terms of the Operating Line of Credit between the Loan Parties and Lender and shall be secured by the Rabo Collateral.

N. The Loan Parties may not terminate the CRO Team, without consent from RAF.

5

3. <u>Amendment and Restatement of Paragraph 3(B)(iii) of the Forbearance Agreement</u>. As partial consideration for RAF's waivers and continuing forbearance and the additional consideration set forth herein, paragraph 3(B)(iii) of the Forbearance Agreement is amended and restated in its entirety to provide as follows: "(iii) the end of the Forbearance Period, which is **June 30, 2023.**"

4. <u>Affirmation of Loan Parties Regarding Representations and Warranties</u>:  The Loan Parties each jointly and severally represent and warrant to RAF that, on and as of the date hereof and after giving effect to this Amendment, all of the representations and warranties contained in the Forbearance Agreement are and remain true, correct and complete in all respects as of the date hereof as though made on and as of the effective date of the Forbearance Agreement.  The Loan Parties also each jointly and severally represent and warrant to RAF that the Forbearance Agreement, as amended by this Amendment, and the Loan Documents to which the Forbearance Agreement relates, remain in full force and effect.

5. <u>Affirmation by Loan Parties of Continuing Events of Default and of Absolute and Unconditional Obligations Under the Loan Documents</u>.  The Loan Parties each jointly and severally represent and warrant to RAF that, as of the date of this Amendment, (a) the Events of Default identified in the Forbearance Agreement continue to exist and cannot be cured, (b) all other facts and representations set forth in the Forbearance Agreement remain true, correct and complete in all respects, and (c) their obligations to pay and perform all of their obligations under the Loan Documents and to satisfy all of their duties under the Loan Documents are absolute and unconditional, and there exists no right of set-off or recoupment, counterclaim or defense of any kind or nature whatsoever to payment and performance of the RAF Indebtedness and fulfillment of the Loan Parties' duties under the Loan Documents.

6. <u>Preconditions to Amendment</u>.  The terms and conditions of this Amendment, and its effectiveness, are expressly conditioned upon this Amendment having been fully executed and delivered to the Parties.

7. <u>Release and Waiver of Claims.</u>  THE LOAN PARTIES, JOINTLY AND SEVERALLY, BOTH FOR THEMSELVES AND FOR ALL PERSONS OR ENTITIES CLAIMING BY, THROUGH OR UNDER THEM, HEREBY WAIVE, RELEASE AND FULLY DISCHARGE RAF, AND RAF'S PARENTS, SUBSIDIARIES, AFFILIATES, PREDECESSORS, SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS, ATTORNEYS, EMPLOYEES AND REPRESENTATIVES (COLLECTIVELY, THE **"RELEASED PARTIES"**) FROM ANY AND ALL MANNER OF CLAIMS, ACTIONS, CAUSES OF ACTION IN LAW OR IN EQUITY, SUITS, DEBTS, LIENS, CONTRACTS, LIABILITIES, CLAIMS, DEMANDS, DAMAGES, LOSSES, FEES, COSTS, EXPENSES, SET OFFS, OR CLAIMS FOR RECOUPMENT, OF ANY NATURE WHATSOEVER, KNOWN OR UNKNOWN, FIXED OR CONTINGENT THAT ANY OF THEM HAVE OR MAY HAVE OR CLAIM AGAINST THE RELEASED PARTIES, FROM THE BEGINNING OF TIME TO THE CLOSING DATE, BASED UPON ANY CONDUCT, CLAIMS, ACTIONS OR OMISSIONS OF THE RELEASED PARTIES RELATING OR PERTAINING IN ANY WAY TO THE LOANS, THE LOAN DOCUMENTS, THE RABO COLLATERAL, THE RAF INDEBTEDNESS, OR THE NEGOTIATIONS RELATING TO THIS AMENDMENT AND THE OTHER DOCUMENTS EXECUTED IN CONNECTION WITH THIS AMENDMENT OR THE FORBEARANCE AGREEMENT AND ANY OTHER INSTRUMENTS AND

6

AGREEMENTS EXECUTED BY ANY LOAN PARTY IN CONNECTION WITH EITHER THE LOAN DOCUMENTS, THE FORBEARANCE AGREEMENT OR THIS AMENDMENT, OR ANY OTHER ACT OR OMISSION THAT HAS OCCURRED PRIOR TO THE CLOSING DATE, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS OR CAUSES OF ACTION FOR USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR CONTRACT OR AT EQUITY, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

8.    Ratification; Effectiveness of Loan Documents and Forbearance Agreement. Each of the Loan Parties hereby ratifies and confirms all of the Loan Documents, the Forbearance Agreement and the RAF Indebtedness in all respects as of the date of this Amendment, except as expressly modified by this Agreement. Except to the extent specifically amended or modified by the terms of this Amendment, all of the terms, conditions and provisions of the Loan Documents and of the Forbearance Agreement will remain unmodified, and the Loan Documents and the Forbearance Agreement, to the extent amended or otherwise affected by the specific terms of this Amendment, shall remain in full force and effect. All references to the Loan Documents or the Forbearance Agreement in this Amendment or in any other document or instrument between any of the Loan Parties and RAF will be construed to be references to the Loan Documents or the Forbearance Agreement, as applicable, to the extent modified by the specific terms of this Amendment.

9.    No Commitment to Extend, Modify or Forbear. EXCEPT AS SPECIFICALLY PROVIDED IN THE FORBEARANCE AGREEMENT AND THIS AMENDMENT, RAF IS NOT COMMITTED, AND IS NOT COMMITTING AT THIS TIME, TO EXTEND, MODIFY OR OTHERWISE RESTRUCTURE ANY LOANS, OR FORBEAR FROM EXERCISING ANY OF ITS RIGHTS OR LEGAL REMEDIES. NO PRIOR COURSE OF DEALING, NO USAGE OF TRADE, AND NO ORAL STATEMENTS OR COMMENTS BY RAF OR ITS OFFICERS, EMPLOYEES, ATTORNEYS OR OTHER AGENTS WILL BE DEEMED TO BE A COMMITMENT TO EXTEND, MODIFY, OR OTHERWISE RESTRUCTURE THE LOANS OR FORBEAR FROM EXERCISING ANY OF RAF'S RIGHTS OR REMEDIES, EXCEPT AS EXPRESSLY SET FORTH IN THE FORBEARANCE AGREEMENT, AS MODIFIED BY THIS AMENDMENT, OR UNLESS THE SAME SHALL BE REDUCED IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF RAF.

10.    Integration. This Amendment, along with the Forbearance Agreement it amends, supersedes any prior understandings or agreements between the parties, whether written or verbal, respecting the subject matter of this Amendment and contains the entire understanding of the Parties with respect thereto.

11.    Counterparts. This Amendment may be executed in any number of identical counterparts, each of which, once executed and delivered in accordance with the terms of this Amendment, will be deemed an original, with all such counterparts taken together constituting one and the same instrument. Delivery by facsimile, encrypted e-mail or e-mail file attachment of any such executed counterpart to this Amendment will be deemed the equivalent of the delivery of the original executed agreement or instrument.

7

IN WITNESS WHEREOF, the Parties hereto have duly executed this First Amendment
to Amended and Restated Forbearance Agreement as of the Closing Date first above written.

**LOAN PARTIES:**

**McCLAIN FEED YARD, INC.**, a Texas
corporation

By: _____
Name: Brian Keith McClain
Title: President & Owner

**McCLAIN FARMS, INC.**, a Kentucky
corporation

By: _____
Name: Brian Keith McClain
Title: President & Owner

**7M CATTLE FEEDERS, INC.**, a Kentucky
corporation

By: _____
Name: Brian Keith McClain
Title: President & Owner

_____
**BRIAN KEITH McCLAIN**, an individual

**RAF/LENDER/RABO:**

**RABO AGRIFINANCE LLC**, a Delaware
limited liability company

By: _____
Its: _____ VP-LFR _____

8